THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
VINCENT PATTERSON, Defendant-Appellee.

Fourth District No. 4—90—0100

Opinion filed December 31, 1990.

STEIGMANN, J., dissenting.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman and Timothy J. Londrigan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

The State appeals from an order suppressing a conversation between defendant inmate and an internal affairs investigator. We affirm.

The undisputed facts are these. Defendant is a prison inmate at the Pontiac Correctional Center in Pontiac, Illinois, serving a natural life sentence for offenses unrelated to this matter. On June 29, 1989, during a routine "shakedown" search of prison cells, prison officials found two knife-like instruments, commonly known as shanks, in defendant's cell. Defendant was the sole occupant of the cell at the time the shanks were found. Prison officials immediately ticketed defendant for the possession of the shanks, and took him to a housing unit called "segregation." Prison officials house inmates in segregation as punishment for disciplinary infractions or pending disciplinary hearings. Inmates in segregation are locked in their cells 24 hours a day; not permitted to attend classes or job assignments; permitted to shower and exercise on a limited basis, but only under the direct supervision of officers; escorted in restraints everywhere they go; and are not permitted to make telephone calls. Segregation is the most restrictive placement for an inmate.

On August 1, 1989, Richard D. Irvin, an internal investigator with the Department of Corrections (DOC) at Pontiac, called defendant to his office for an "interview." Irvin's primary duty at Pontiac is to investigate incidents and prepare cases for prosecution. Warden Lowery had asked Irvin to "interview" defendant and sent Irvin an incident report indicating that defendant was ticketed for allegedly possessing the shanks. At the time of the interview, Irvin knew defendant was in

segregation, but did not know that defendant had been placed in segregation as an administrative punishment for allegedly possessing shanks. Irvin did not learn of the reason defendant was placed in segregation until after the interview. However, when a shank is found in a cell, at least one inmate goes to segregation.

Police officers escorted defendant in restraints, including handcuffs, from his cell in segregation to Irvin's office, which is located outside the confines of the prison setting. Irvin's office is positioned next to several other offices and contains several chairs, a filing cabinet, and his desk. The restraints remained on defendant during the interview. No other prison personnel were in Irvin's office at the time of the interview.

Defendant could have refused to go to Irvin's office, or to respond to Irvin's questions during the interview. However, such a refusal is a violation of prison rules and would result in a penalty. A uniformed correctional officer, not Irvin, would have the discretion to issue defendant a ticket for refusing to cooperate. The penalty for being ticketed ranges from a verbal reprimand to several days in segregation.

When defendant arrived at Irvin's office, Irvin did not introduce himself as an official from internal affairs. However, Irvin did have a sign on the door and an identification tag on his suit which indicated he was from internal affairs. In addition, a nameplate on the desk read "Chief Irvin." Irvin was formerly the chief of police in Dwight, Illinois.

Irvin did not give defendant *Miranda* warnings prior to the interview. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) In fact, upon orders from the State's Attorney of Livingston County, Irvin and the other investigators at Pontiac do not give *Miranda* warnings in interviews with inmates alleged to have possessed shanks. This policy evolved after an inmate, Brian Nelson, successfully mounted a necessity defense to a charge of possession of a weapon in DOC. *Miranda* warnings are given before questioning in other types of cases, however, such as when one inmate stabs another with a shank. The reason for not giving *Miranda* warnings prior to interviews with inmates alleged to have possessed shanks is the belief that the inmates would become "terrorized" and not talk about their safety concerns. Irvin had given *Miranda* warnings to inmates hundreds of times in the past and only a few of these inmates had responded to questioning.

There are two reasons why prison officials conduct interviews with inmates alleged to have possessed shanks: (1) for internal institu-

tional security, and (2) to prepare for an actual, potential criminal case. Irvin wanted to know if defendant feared for his own safety and whether defendant would claim to have a necessity defense. To obtain this information from the inmates, the State's Attorney's office had prepared a series of questions concerning the necessity of possessing a shank. If an inmate reveals no necessity during the interview, the information is used to negate the possibility of the inmate asserting a necessity defense if charges are subsequently filed. Prison officials apparently only became concerned with the inmates' (apprehensions concerning their) safety after inmate Nelson successfully used the affirmative defense of necessity at his trial for possessing a weapon in prison. The interviews were not conducted until after Nelson staged his successful defense.

A few inmates actually do benefit from the interview, as not all shank possession cases are prosecuted. The Department of Corrections and State's Attorney decide which cases to prosecute. There have been some cases where inmates possessing shanks are not prosecuted because they informed internal affairs of fears for their lives.

During the interview, defendant did not specifically mention a necessity defense. However, defendant did make various statements indicating he would be inclined to possess a weapon because he saw a friend stabbed at another prison.

On October 2, 1989, the State filed an indictment against defendant alleging the unlawful possession of weapons by a person confined in a facility of the Illinois DOC in violation of section 24—1.1(b) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1(b)). The charge under section 24—1.1(b) is a Class 1 felony, carrying a potential prison term of 4 to 15 years, or an extended term of 15 to 30 years. (Ill. Rev. Stat. 1989, ch. 38, pars. 24—1.1(d), 1005—8—1(a)(4), 1005—8—2(a)(3).) The State later filed a second charge against defendant alleging the possession of a weapon by a convicted felon in violation of section 24—1.1(a) of the Code. This second charge is a Class 3 felony, carrying a potential prison term of 2 to 5 years, or an extended term of 5 to 10 years. Ill. Rev. Stat. 1989, ch. 38, pars. 24—1.1(a), (d), 1005—8—1(a)(6), 1005—8—2(a)(5).

On December 18, 1989, defense counsel filed a motion to suppress defendant's statements made to Irvin during the August 1, 1989, interview. A hearing was held on January 24, 1990, at which Irvin was the sole witness. Irvin's testimony provided the basic facts. The court granted defendant's motion to suppress, but allowed the statements to be used for impeachment purposes. In an extensive written order, the court concluded:

"10. Although defendant had not been charged with the offense of Unlawful Possession of Weapon by Person in the Custody of the Department of Corrections at the time of his 'interview' on August 1, 1989, there appears to be no question that it was the intention of the Illinois Department of Corrections to pursue criminal charges by attempting to obtain an indictment.

11. Although the People take the position that *Miranda* is not required unless a prison inmate has been formally charged with an offense, this court finds that in circumstances where a prison inmate has been identified by prison officials as a primary suspect and an investigation has focused upon that individual for an offense occurring within the prison that they are obligated to give to that inmate *Miranda* warnings before questioning him about the specific offense in question. The court rejects the People's position that the choice is to never *Mirandize* uncharged inmates or to constantly *Mirandize* every inmate any prison official ever talks to for any purpose. Once a prison investigation has focused on an inmate for [a] specific offense, that inmate should receive *Miranda* warnings. This is in recognition of the fact that a prison inmate, unlike someone who is not incarcerated, has no real choice as to whether to be subjected to questioning even if he refused to answer. He literally is not free to go 'home' unless he can persuade prison officials to terminate an interview and permit him to return to his cell which many inmates describe as their 'house.' "

The court also noted that although defendant was physically restrained when brought to Irvin's office, no threats or physical coercion was used to obtain any statement from defendant, and the specific location of the questioning was a comparatively nonthreatening environment. The court found no just reason to delay enforcement or appeal of the suppression order, and the State filed a timely notice of appeal.

On appeal, the State argues that the trial court erred in suppressing statements defendant made to Irvin during the interview in the absence of *Miranda* warnings. The State believes the court erred by applying a *per se* rule requiring *Miranda* warnings anytime such a prisoner is questioned by a prison official. Defendant responds that the trial court did not err in suppressing his statements because, in view of the totality of the circumstances, *Miranda* warnings were required.

■ The United States Supreme Court in *Miranda* held that when an individual is subjected to police interrogation while in custody, he

must be clearly advised of certain rights pertaining to his fifth amendment right against self-incrimination. An individual subjected to "custodial interrogation" must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning, if he so desires." (*Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) The *Miranda* Court was concerned with the coerciveness *inherent* in situations where suspects are cut off from the outside world and surrounded by antagonistic forces in a police-dominated atmosphere. "('The "principal psychological factor contributing to a successful interrogation is privacy—being alone with the person under interrogation)" ' ***." (Emphasis in original.) (*Illinois v. Perkins* (1990), 496 U.S. 292, 296, 110 L. Ed. 2d 243, 251, 110 S. Ct. 2394, 2397, quoting *Miranda*, 384 U.S. at 449, 16 L. Ed. 2d at 709, 86 S. Ct. at 1615, quoting Inbau & Reid, Criminal Interrogation and Confessions 1 (1962).) The *Miranda* Court believed that unless such warnings were given to dispel the compulsion inherent in custodial surroundings, no statement obtained from a defendant could truly be the product of his free choice. (*Miranda*, 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.) Absent waiver, statements obtained from an individual subjected to custodial interrogation by police without first being given *Miranda* warnings are not admissible into evidence.

A literal reading of *Miranda*'s "custodial interrogation" suggests that a prisoner questioned by a prison official would always be entitled to *Miranda* warnings prior to the interrogation. This is because such a prisoner is literally in custody and subject to interrogation. The Court stated in *Miranda*:

> "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.

The Supreme Court later indicated that it might give effect to a literal interpretation of *Miranda*'s "custodial interrogation." (*Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503.) In *Mathis*, the defendant was in prison for a previous offense when questioned by Internal Revenue Service (IRS) officials about his tax returns. The IRS investigator did not give the defendant *Miranda* warnings prior to the questioning, and the defendant sought to exclude incriminating statements from evidence. The trial court admit-

ted the evidence, and the defendant was convicted. On appeal, the defendant in *Mathis* argued that *Miranda* applied to his situation. The government argued that the case fell outside of *Miranda* because (1) the questions were asked as part of a routine tax investigation where no criminal proceedings might ever be brought; and (2) the defendant was in jail for a separate offense and had not been brought to jail by the officers questioning him. The Supreme Court rejected the government's arguments, stating, "These differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." (*Mathis*, 391 U.S. at 4, 20 L. Ed. 2d at 384, 88 S. Ct. at 1504-05.) The Court noted that although routine questioning by the IRS may be initiated for the purpose of a civil action rather than criminal prosecution, it also frequently leads to criminal charges, as it did here. The Court concluded by finding nothing in *Miranda* to call for curtailment of the warnings to individuals under interrogation based upon the reason for custody.

This literal interpretation of *Miranda*'s custodial interrogation in prison settings has not been adopted by subsequent Federal appellate decisions, which have interpreted *Mathis* to mean only that one need not be in custody for the matter to which the questioning relates for *Miranda* to apply. (See *Cervantes v. Walker* (9th Cir. 1978), 589 F.2d 424; *United States v. Scalf* (10th Cir. 1984), 725 F.2d 1272; *United States v. Conley* (4th Cir. 1985), 779 F.2d 970; *Leviston v. Black* (8th Cir. 1988), 843 F.2d 302, *cert. denied* (1988), 488 U.S. 865, 102 L. Ed. 2d 138, 109 S. Ct. 168; *United States v. Willoughby* (2d Cir. 1988), 860 F.2d 15, *cert. denied* (1989), 488 U.S. 1033, 102 L. Ed. 2d 978, 109 S. Ct. 846.) This literal interpretation may also have been rejected in *dicta* in the recent United States Supreme Court opinion in *Perkins*, which stated:

> "(The bare fact of custody [being imprisoned] may not in every instance require a warning even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that issue here.)" (*Perkins*, 496 U.S. at 299, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398.)

However, by indicating that *Miranda* warnings might not be required in *every* instance when an inmate suspect knows he is speaking to an official, the Court necessarily implied that *Miranda* warnings would be required in some of these situations.

The Federal appellate decisions discussing *Miranda* warnings in prison settings agree that while *Miranda* may apply to one who is in custody for an offense unrelated to the interrogation (*e.g., Mathis,*

391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503), incarceration does not by itself render an interrogation custodial. (*Cervantes*, 589 F.2d at 427.) Further, *Miranda* warnings were not meant "to hamper the traditional function of police officers in investigating crime"; there is a difference between custodial interrogation, requiring *Miranda* warnings, and on-the-scene questioning, not requiring such warnings. (*Miranda*, 384 U.S. at 477, 16 L. Ed. 2d at 725, 86 S. Ct. at 1629.) These decisions also recognize the fact that a prison inmate is not in the same position as a person previously at liberty who is subsequently taken into custody. To afford a prisoner *Miranda* warnings before every type of questioning would lead "to the illogical position of providing greater protection for a prisoner than to his nonimprisoned counterpart." (*Cervantes*, 589 F.2d at 427.) Therefore, instead of focusing on the restrictions an inmate necessarily incurs, Federal appellate courts have determined whether "custody" for *Miranda* purposes exists by focusing on any further limitations placed on the prisoner. (*Cervantes*, 589 F.2d at 424.) In determining whether further limitations have been placed on defendants, courts must consider the totality of the circumstances, including the individual's " 'freedom to leave the scene and the purpose, place and length' of the questioning." (*Leviston*, 843 F.2d at 304, quoting *United States v. Helmel* (8th Cir. 1985), 769 F.2d 1306, 1320.) The relevant inquiry, using an objective standard, is whether a reasonable man in the suspect's position would have understood himself to be in custody. (*Leviston*, 843 F.2d at 304, citing *Berkemer v. McCarty* (1984), 468 U.S. 420, 442 & n.35, 82 L. Ed. 2d 317, 336 & n.35, 104 S. Ct. 3138, 3151 & n.35.) The *Miranda* doctrine will be enforced strictly in those situations in which *Miranda* concerns are implicated. *Willoughby*, 860 F.2d at 23.

A brief review of the facts of several of these Federal decisions on custodial interrogation in a prison setting is helpful in this analysis. In *Cervantes*, a sheriff's deputy moved defendant inmate from one jail cell to another after the defendant was involved in a fight. The deputy directed the defendant to gather his belongings and took defendant to the jail library so the shift commander could talk to the defendant before the move. The defendant left his belongings outside the library, and the deputy searched the belongings according to standard jail procedure. Upon finding a small matchbox containing a green odorless substance, the deputy went into the library and asked the defendant what it was. The defendant replied, "That's grass, man." (*Cervantes*, 589 F.2d at 427.) The deputy then arrested the defendant.

The issue on appeal in *Cervantes* was whether the deputy's ques-

tioning constituted custodial interrogation requiring *Miranda* warnings. The *Cervantes* court held that the defendant was not subjected to custodial interrogation and that *Miranda* did not apply. The reason for the court's decision was that the deputy's questioning of the defendant was on-the-scene questioning, a situation not requiring *Miranda* warnings, rather than a custodial interrogation. The court emphasized that the questioning took place in the prison library and appeared to have been a spontaneous reaction to the discovery.

In *Scalf*, the defendant was in segregation for a previous offense. On the morning of the incident in question, the defendant left his cell in segregation and attacked another inmate with two handmade knives. Immediately after the incident, an officer locked all inmates in their cells. A security officer joined the first officer in segregation and was told that the defendant stabbed another inmate. The security officer asked the defendant " 'what was going on, what the problem was.' " (*Scalf*, 725 F.2d at 1273.) The defendant told the security officer he did not want to have any problems with the officers and that he did " 'not like that nigger [the stabbed inmate].' " (*Scalf*, 725 F.2d at 1273.) The defendant also told the security officer, in response to the question of where the knives were, that he had thrown two knives out a window. This was not true, however, as officers later found the two knives in the defendant's commode.

On appeal, the issue in *Scalf* was whether the defendant was entitled to *Miranda* warnings. The appellate court held that such warnings were not required in this instance. The court emphasized the facts that the officer who questioned the defendant was a security guard, and not an investigation or interrogation officer, and that the defendant was not in custody or under arrest for this incident, but was simply in his cell. Thus, the questioning did not give rise to "interrogation" under *Miranda*. The court found this to be on-the-scene questioning, as in *Cervantes*. Prison officials did not deprive defendant of his relative freedom or question him in a coercive environment.

In *Conley*, an inmate was fatally stabbed at breakfast and a prison official discovered the defendant inmate wearing an Ace bandage on his wrist covering a wound. Prison officials escorted the defendant to a conference room in the prison "control room" to await transfer to the infirmary for medical treatment. The defendant discussed the assault with corrections officers in the conference room before and after the treatment. Prior to the treatment, two corrections officers asked the defendant how he was injured. The defendant told the officers that two inmates attacked the victim and he was stabbed while helping the victim. After the treatment, one of the officers asked the

defendant if he was " 'up to [his] same old shit again.' " (*Conley*, 779 F.2d at 971.) The defendant replied that the victim and he were " 'cool,' " meaning they were friends, but that the victim had a bad attitude. (*Conley*, 779 F.2d at 971.) When questioned about the identity of the attackers, the defendant claimed ignorance because the attackers had worn ski masks.

On appeal, the defendant argued he was "in custody" at all times during the conversations with prison officials and his statements should be suppressed because the officials did not administer *Miranda* warnings prior to the conversation. Relying on *Cervantes*, the *Conley* court found *Miranda* inapplicable in this situation because the defendant was not in custody for *Miranda* purposes. The court noted that the defendant was taken to the conference room to await medical treatment, not for interrogation. And, although the defendant was handcuffed, this was normal procedure for transferring an inmate to the infirmary. The court finally noted that both officers were on very friendly terms with the defendant, and they questioned defendant as a witness to the assault, not as a suspect. The court concluded that the defendant's freedom of movement could not be characterized as more restricted than that of other prisoners transferred to the infirmary. *Conley*, 779 F.2d at 974.

In *Leviston*, the defendant inmate contacted an officer of the Omaha police department to give him information regarding a robbery. The defendant met with the officer and gave him the information. The officer discovered the information had no basis and informed defendant of this in a second interview. The defendant then implicated himself in the robbery, and the officer gave the defendant *Miranda* warnings. Upon conviction, defendant appealed, arguing that the incriminating statements he gave the officer should be suppressed because they were not preceded by *Miranda* warnings. The appellate court disagreed and found *Miranda* inapplicable in this situation because the defendant initiated the police inquiry, and both interviews arose out of the defendant's desire to speak about the robbery. Moreover, the defendant voluntarily went to the prison interview room on both occasions to speak with the officer and was free to end the conversation and leave at any time. The appellate court concluded that the defendant could not reasonably have believed he was in custody with respect to the robbery during either interview.

In *Willoughby*, defendant inmate sent for his girlfriend and made incriminating statements to her while awaiting trial. The inmate's girlfriend was an informant, and the trial court admitted the incriminating statements into evidence at the defendant's trial. After convic-

tion, the defendant argued on appeal that the trial court should have suppressed the incriminating statements because he was not given *Miranda* warnings prior to making the statements. The appellate court disagreed and found *Miranda* inapplicable because the statements were voluntary. The defendant could have terminated the conversation with his girlfriend at any time.

Finally, in *Perkins*, the State placed an undercover agent in the cell of the defendant, who was then incarcerated on charges unrelated to the subject of the agent's investigation. The defendant made statements incriminating himself in the crime the agent was investigating. The trial court suppressed the defendant's incriminating statements and the State appealed. On appeal, the defendant argued the statements were inadmissible because the agent did not give him *Miranda* warnings prior to making the statements. The United States Supreme Court disagreed and held that the essential ingredients for *Miranda* to apply, a police-dominated atmosphere and compulsion, are not present when an incarcerated person speaks freely to someone he believes to be a fellow inmate. *Perkins*, 496 U.S. at 298, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398.

 The State first argues that defendant was not "in custody" for *Miranda* purposes when he spoke to Irvin and relies on the Federal appellate cases which conclude there must be an added imposition on freedom of a prisoner's movement for *Miranda* warnings to be required in a prison setting. Defendant was brought from segregation to what the State describes as "the more relaxed setting of a prison official's office." The State argues that (1) although defendant was in segregation, no formal charges were pending; (2) defendant was free not to go to Irvin's office and free not to answer any questions; (3) defendant was not unaccustomed to the environment; and (4) no additional limitations of freedom were placed on defendant so as to subject him to the will of his interrogator. The State believes that to argue defendant was "in custody" for *Miranda* purposes would elevate the rights of the inmate above those of the average citizen and substantially curtail the ability of the State to effectively maintain and safeguard the prison setting. The State also believes it is virtually impossible to distinguish this type of conversation from any other which may take place on a casual basis between prison officials and inmates generally.

We disagree with the State and hold that defendant was "in custody" for *Miranda* purposes. The State ignores the fact that defendant had been administratively charged with possessing the shanks and had been in segregation as a result. Although no formal charges were

pending, the trial court found DOC intended to pursue charges by attempting to obtain an indictment. In this regard, the instant case is very similar to *Mathis*. Next, defendant was not free to refuse to go to Irvin's office, or refuse to answer Irvin's questions. Prison guards could have ticketed defendant for such refusals. Further, there is no evidence that defendant was ever in Irvin's office before the interview. It thus cannot be said that defendant was "not unaccustomed" to the environment. Finally, there were additional limitations on defendant's freedom. Defendant was placed in segregation because of the alleged possession of the shanks and was escorted in restraints to Irvin's office. These restraints remained on defendant throughout the interview. Although it was standard procedure for an inmate in segregation to wear restraints, defendant was in segregation because of the alleged possession of shanks.

■ The State next argues there was no "interrogation" for *Miranda* purposes. Again, we disagree. The State argues that although Irvin asked questions addressing peripheral issues in a general nature, Irvin asked no questions concerning defendant's guilt or innocence. The State ignores the fact that an admitted purpose of the "interview" was to elicit information concerning a necessity defense for an actual potential criminal case against defendant. It cannot be said that the interview was not an interrogation for *Miranda* purposes.

■ The State concludes by arguing that the trial court apparently applied a *per se* rule to the effect that an inmate who is subject to questioning is automatically in custody and therefore entitled to *Miranda* warnings without undertaking to inquire whether any of the circumstances surrounding the custody and interrogation in cases of this kind provide reason for application of *Miranda*. The State believes that such a *per se* rule would deprive law-enforcement officers and prison administrators of their ability to conduct such informal questioning free of the constraints of *Miranda* procedures. The State misinterprets the trial court's ruling, which was "that in circumstances where a prison inmate has been identified by prison officials as a primary suspect and an investigation has focused upon that individual for an offense occurring within the prison, that they are obligated to give to that inmate *Miranda* warnings before questioning him about the specific offense in question." Although the approach espoused by the trial court was in error (the United States Supreme Court expressly rejected the "focus" approach in *Beckwith v. United States* (1976), 425 U.S. 341, 48 L. Ed. 2d 1, 96 S. Ct. 1612), the trial court did not use the general *per se* rule described by the State in its brief.

We conclude that while the trial court's order granting defendant's motion to suppress was based upon an erroneous approach, the result reached was nevertheless correct. Under the totality of circumstances, defendant was entitled to *Miranda* warnings prior to Irvin's "interview." Unlike the Federal decisions cited finding *Miranda* inapplicable in certain situations, the questioning of defendant here was not on the scene or spontaneous. Also, Irvin did not interview defendant in his prison cell, or in an open place, but in Irvin's office. Moreover, Irvin was an investigator, not a security guard, and defendant knew he was talking to an investigator. Finally, Irvin questioned defendant as a suspect, not as a witness, and defendant was not free to end the interview at any time. This case is very similar to the *Mathis* case, but with the added restrictions of being placed in segregation and being interviewed in restraints. Using an objective standard, a reasonable man in defendant's position would have believed himself to be "in custody" with respect to the allegations concerning the possession of the shanks. Defendant was also "interrogated" for *Miranda* purposes. Accordingly, the trial court is affirmed.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE STEIGMANN, dissenting:

In my judgment, the majority has endorsed an erroneous trial court analysis. As a result, I respectfully dissent.

A complex body of law has developed over the 24 years since the United States Supreme Court first announced that procedural safeguards were needed to protect an individual's fifth amendment privileges. (See *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.) As the majority in this case correctly points out, the general objective of the Court was to protect the rights of individuals who have been "cut off from the outside world and surrounded by antagonistic forces in a police-dominated atmosphere." (207 Ill. App. 3d at 109.) While this objective is entirely legitimate in the typical case in which a person, previously at liberty, has been taken into police custody, it should not be extended to cover a person who has been "cut off from the outside world" because he is serving a sentence in a State penitentiary. To extend this objective to cover such persons trivializes and demeans its appropriate use.

In cases like this one, where the applicability of *Miranda* is raised, courts need to address the following issues: (1) what are the

general principles of *Miranda* concerning custodial interrogation; and (2) how should these principles be applied in the context of the particular case before the court?

### 1. *Miranda* Principles

*Miranda* is a case of limited contextual application. (See *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.) "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a [particular curtailment of freedom of action] exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty* (1984), 468 U.S. 420, 437, 82 L. Ed. 2d 317, 333, 104 S. Ct. 3138, 3148-49.

*Miranda* is particularly applicable to the custodial interrogation of free citizens pulled into the foreign environment of the police. Perhaps the best analysis of this point is provided by Professor Yale Kamisar, as follows:

> "It is the impact on the suspect's mind of the *interplay* between police interrogation and police custody—each condition *reinforcing* the pressures and anxieties produced by the other—that, as the *Miranda* Court correctly discerned, makes 'custodial police interrogation' so devastating. It is the suspect's realization that the *same persons* who have cut him off from the outside world, and have him in their power and control, want him to confess, and are determined to get him to do so, that makes the 'interrogation' more menacing than it would be without the custody and the 'custody' more intimidating than it would be without the interrogation.
>
> It is this *combination* of 'custody' and 'interrogation' that creates—and, in the absence of 'adequate' protective devices,' enables the police to exploit—an '*interrogation* environment' designed to 'subjugate the individual to the will of his examiner.' It is this *combination*—more awesome, because of the interplay, than the mere sum of the 'custody' and 'interrogation' components—that produces the 'interrogation atmosphere,' '*interrogation*...in a *police dominated* atmosphere,' that 'carries its own badge of intimidation,' that 'exacts a heavy toll in individual liberty and trades on the weakness of individuals,' and that is so 'at odds' with the privilege against compelled self-in-

crimination." (Emphasis in original.) (Kamisar, *Brewer v. Williams, Massiah, & Miranda: What is 'Interrogation'? When Does It Matter?*, 67 Geo. L.J. 1, 63-64 (1978) (quoting terminology of *Miranda*).)

Whether these same concerns are applicable to the context of prisons and prisoners is addressed next.

### 2. Applying *Miranda* Principles to Prisons and Prisoners

*Miranda* itself concerned the separate cases of four men, each placed into custody by the police and interrogated at a police station for the purpose of obtaining a confession. (*Miranda*, 384 U.S. at 440, 16 L. Ed. 2d at 704, 86 S. Ct. at 1610.) Since that 1966 decision, the Supreme Court has utilized *Miranda* in the specific context of prisons and prisoners only three times.

In *Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503, the Court reviewed the admissibility of statements made to an IRS agent by a prisoner serving a State sentence. In a five to three decision, the Court rejected the government's contentions "that tax investigations [we]re immune from the *Miranda* requirements for warnings to be given a person in custody," or that the warnings were required only when questioning someone who is in custody in connection with the crime under investigation. *Mathis*, 391 U.S. at 4-5, 20 L. Ed. 2d at 385-86, 88 S. Ct. at 1505.

Eight years later, the Court rejected the argument that *Miranda* or *Mathis* applied to the question of whether counsel must be provided at civil prison disciplinary hearings. *Baxter v. Palmigiano* (1976), 425 U.S. 308, 315, 47 L. Ed. 2d 810, 819, 96 S. Ct. 1551, 1556 (stating "[t]he Court has never held, and we decline to do so now, that the requirements of those cases must be met to render pretrial statements admissible in [contexts] other than criminal cases").

Finally, earlier this year the Court held that a *Miranda* warning was not required when an incarcerated suspect voluntarily spoke to an undercover law enforcement officer posing as a fellow inmate. (*Perkins*, 496 U.S. at 300, 110 L. Ed. 2d at 253, 110 S. Ct. at 2399.) The Court distinguished *Mathis*, stating that while *Mathis* allows a *Miranda* analysis to be applied to meetings between the State and a prisoner, there was "no reason to assume the possibility that the suspect might feel coerced" in *Perkins* because the defendant was not aware that he was talking to a government agent. (*Perkins*, 496 U.S. at 299, 110 L. Ed 2d at 252, 110 S. Ct. at 2398.) The Court concluded parenthetically that "[t]he bare fact of custody may not in every instance require a warning even when the suspect is aware that

he is speaking to an official, but we do not have occasion to explore that issue here." *Perkins*, 496 U.S. at 299, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398.

### 3. How the Law Should Be Applied in this Case

The majority concludes its opinion by stating that "a reasonable man in defendant's position would have believed himself to be 'in custody.' " (207 Ill. App. 3d at 116.) Yet, could *any* reasonable prison inmate not arrive at this same conclusion wherever he may be within the walls of a State prison? As opposed to other persons who are subjected to police interrogation, the prison inmate's custodial status is not transitory; his questioners have not "cut him off from the outside world." He undergoes no subtle pressures from the fact of his custody to satisfy his questioners in the hope that they might release him; instead, the prison inmate knows that his custody will continue as a result of a court order no matter what he tells his questioners and no matter how satisfied or dissatisfied they may be with his responses.

In a decision predating *Perkins*, this court declined to require that *Miranda* warnings be given to inmates solely because of their inmate status. (*People v. Johnson* (1990), 197 Ill. App. 3d 762, 765, 555 N.E.2d 412, 413.) "[C]ustody in the prison setting 'necessarily implies a change in the surroundings of the [inmate] which results in an added imposition on his freedom of movement.' " (*Johnson*, 197 Ill. App. 3d at 765, 555 N.E.2d at 413, quoting *Cervantes*, 589 F.2d at 428.) While this court acknowledged the holding of *Mathis*, that inmates incarcerated on unrelated charges are "in custody in the literal sense" (*Johnson*, 197 Ill. App. 3d at 765, 555 N.E.2d at 413; *cf. Perkins*, 496 U.S. at 297, 110 L. Ed 2d at 251, 110 S. Ct. at 2397 (stating "[w]e reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense")), this court declined to uphold a suppression order absent coercive pressures at the time the incriminating statements were made. *Johnson*, 197 Ill. App. 3d at 765-66, 555 N.E.2d at 413-14.

Defendant in the present case had been previously arrested, tried, convicted, and sentenced to prison. Given this history, one can reasonably assume that defendant was familiar with his fifth amendment protections when he was interviewed in prison. "At this point in our history virtually every schoolboy is familiar with the concept, if not the language of the [fifth amendment] ***." (*Michigan v. Tucker* (1974), 417 U.S. 433, 439, 41 L. Ed. 2d 182, 190, 94 S. Ct. 2357, 2361.) "Rewarning the defendant *** does not serve the purpose of advising the defendant of a previously unknown right to 'exert some

control over the course of the interrogation.' " *United States v. Rogers* (10th Cir. 1990), 899 F.2d 917, 922-23, quoting *Moran v. Burbine* (1986), 475 U.S. 412, 426, 89 L. Ed. 2d 410, 424, 106 S. Ct. 1135, 1143.

The Supreme Court has recognized that failure to give *Miranda* warnings "does not entitle the suspect to insist that statements made by him be excluded in every conceivable context." (*Tucker*, 417 U.S. at 451, 41 L. Ed. 2d at 197, 94 S. Ct. at 2367.) "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.

*Miranda* was never intended to apply to every interaction between the authorities and suspects. (See *Mathiason*, 429 U.S. at 495, 50 L. Ed. 2d at 719, 97 S. Ct. at 714.) The Court, in creating *Miranda*'s prophylactic protections, sought to strike a balance "between society's legitimate law enforcement interests and the protection of the defendant's Fifth Amendment rights." (*Burbine*, 475 U.S. at 424, 89 L. Ed. 2d at 423, 106 S. Ct. at 1142; see also Markman, *Miranda v. Arizona: A Historical Perspective*, 24 Am. Crim. L. Rev. 193, 211 (1986) (stating that a basic contention of *Miranda* was that its requirements would not be difficult for the police to follow or unduly harmful to law enforcement in general).) As courts extend *Miranda* to new contexts, they should be careful to weigh the balance of each application and to insure that *Miranda*'s "compromise" is not lost to one side or the other (Saltzburg, *Miranda v. Arizona Revisited: Constitutional Law or Judicial Fiat*, 26 Washburn L. J. 1, 23 (1986)). I believe there are legitimate law enforcement interests present in this case.

Concern for the safe and efficient operation of our penal institutions requires "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." (*Wolff v. McDonnell* (1974), 418 U.S. 539, 556, 41 L. Ed. 2d 935, 951, 94 S. Ct. 2963, 2975.) "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." (*Pell v. Procunier* (1974), 417 U.S. 817, 823, 41 L. Ed. 2d 495, 502, 94 S. Ct. 2800, 2804.) "[W]hile persons in government-imposed confinement retain various rights secured by the Bill of Rights, they retain them in forms qualified by the exigencies of prison administration and the special governmental interests that result." *Conley*, 779 F.2d at 973.

The meeting between Irvin and the defendant concerned institutional goals deserving of protection. Irvin asked defendant various

questions relating to defendant's safety and the need for protection within the institution. Defendant, arguing that *Mathis* applies, urges us to find that this meeting was a custodial interrogation. To interpret *Mathis* this broadly "would, in effect, create a per se rule that any investigatory questioning inside a prison requires *Miranda* warnings." *Cervantes*, 589 F.2d at 427 (holding that incarceration does not itself render an interrogation custodial).

The Supreme Court has recognized that a citizen's individual rights may be limited once the person has been introduced into the criminal justice system as a detainee (the term defined in *Bell v. Wolfish* (1979), 441 U.S. 520, 523, 60 L. Ed. 2d 447, 458, 99 S. Ct. 1861, 1865-66, to describe persons charged with a crime, held in custody, and awaiting trial), or as a prison inmate. While convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison (see *Jones v. North Carolina Prisoners' Labor Union, Inc.* (1977), 433 U.S. 119, 129, 53 L. Ed. 2d 629, 641, 97 S. Ct. 2532, 2540 (recognizing reasonable restrictions on first amendment rights); *Meachum v. Fano* (1976), 427 U.S. 215, 225, 49 L. Ed. 2d 451, 459, 96 S. Ct. 2532, 2538 (recognizing a due process right); *McDonnell*, 418 U.S. at 555-56, 41 L. Ed. 2d at 950-51, 94 S. Ct. at 2974-75 (recognizing a due process right); *Procunier*, 417 U.S. at 821-22, 41 L. Ed. 2d at 501, 94 S. Ct. at 2804 (recognizing prisoner's freedom of speech and religion under the first and fourteenth amendments)), these constitutional rights are nonetheless subject to lawful restrictions and limitations. (*Bell*, 441 U.S. at 545, 60 L. Ed. 2d at 472, 99 S. Ct. at 1877 (deferring to prison regulations despite inmates' first, fourth, and fifth amendment claims); *Jones*, 433 U.S. at 130-31, 53 L. Ed. 2d at 641-42, 97 S. Ct. at 2540-41 (restricting inmate's first amendment speech and assembly rights); *Price v. Johnston* (1948), 334 U.S. 266, 285, 92 L. Ed. 1356, 1369, 68 S. Ct. 1049, 1060.) Here, defendant is not even arguing the infringement of a constitutional right, but only that *Miranda* warnings should have been given. "The prophylactic *Miranda* warnings therefore are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" *New York v. Quarles* (1984), 467 U.S. 649, 654, 81 L. Ed. 2d 550, 556, 104 S. Ct. 2626, 2630, quoting *Tucker*, 417 U.S. at 444, 41 L. Ed. 2d at 193, 94 S. Ct. at 2364.

As a last matter, I point out that holding *Miranda* warnings are not applicable to interrogations of prison inmates would not leave the inmates bereft of any constitutional protections. The State would still have to show that statements obtained through such interrogations

were voluntarily given. In other words, incriminating statements extracted from prison inmates as a result of beatings, torture, or other coercive methods would be inadmissible at trial whether or not the prophylactic protections of *Miranda* were deemed applicable to interrogations of inmates.

The nature of the requirement of voluntariness was discussed by Professor Michael H. Graham as follows:

"An involuntary confession or admission is inadmissible. *** Self-incrimination and due process remain as the prime bases for exclusion ***. The test to determine whether a confession is voluntary is to discover if the accused's will was overborne at the time he confessed. [Citation.] If so, the confession cannot be deemed the product of a rational intellect and a free will. [Citation.] The state must establish that the statement was knowingly, intelligently, and voluntarily made by a preponderance of the evidence." M. Graham, Cleary and Graham's Handbook of Illinois Evidence §502.11, at 227-28 (4th ed. 1984).

Because *Miranda* has no application to the interrogation of prison inmates, I conclude that the trial court erroneously suppressed defendant's statements.