(No. 71454.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. VINCENT PATTERSON, Appellee.

*Opinion filed February 20, 1992.*

446

HEIPLE, J., joined by BILANDIC, J., specially concurring.
FREEMAN, J., joined by CLARK, J., dissenting.

Roland W. Burris, Attorney General, of Springfield, and Donald D. Bernardi, State's Attorney, of Pontiac (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Thomas L. Ciecko, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, Robert J. Biderman and Timothy J. Londrigan, of the Office of the State's Attorneys Appellate Prosecutor, of counsel), for the People.

Daniel D. Yuhas, Deputy Defender, and Arden J. Lang, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellee.

Justin D. Smock, Special Assistant Attorney General, of Chicago, for *amicus curiae* Illinois Department of Corrections.

Joseph A. Morris, of Chicago (Maureen P. Cunningham, of Morris, Rathnau & De La Rose, of counsel), for *amicus curiae* Lincoln Legal Foundation.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Vincent Patterson, a prison inmate serving a natural life sentence for offenses unrelated to this case, was indicted for the unlawful possession of a weapon by a person confined in a correctional facility. (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1(b).) At trial, defendant moved to suppress statements he made to a prison official investigating the weapons incident, claiming that he had not been given *Miranda* warnings before the questioning. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The circuit court of Livingston County granted defendant's motion to suppress. The appellate court affirmed the order of suppression, with one justice dissenting. (207 Ill. App. 3d 104.) This court allowed the State's petition for leave to appeal (134 Ill. 2d R. 315). Briefs in support of the State's position have been filed by *amici curiae*, the Lincoln Legal Foundation and the Illinois Department of Corrections.

This case presents the question of whether a prison inmate must be given *Miranda* warnings prior to interviews with prison officials who are investigating security matters within the prison. For the reasons below, we hold that, under the circumstances peculiar to this case, such warnings need not be given.

While serving a natural life sentence at the Pontiac Correctional Center in Pontiac, Illinois, defendant was placed in segregation for six months after two "shanks" (knife-like instruments) were found in his one-person cell during a routine shakedown on June 29, 1989. Segregation is imposed by correctional institutions as a discipli-

nary measure. It limits an inmate's access to the general prison population, and is the most restrictive type of housing available in the institution. Inmates in segregation are locked in their cells 24 hours per day; are not permitted to attend classes or job assignments; are allowed limited opportunities to shower or exercise; are not permitted to make telephone calls; and are escorted in restraints when removed from their cells.

On August 1, 1989, Richard C. Irvin, an internal investigator with the Department of Corrections (Department) at Pontiac, acting upon directions from his superiors, requested an interview with defendant to discuss his possession of the "shanks." Irvin's primary duty at Pontiac is to investigate incidents and prepare cases for prosecution. If defendant had refused to speak with Irvin, Irvin could not have disciplined him. However, if such were the case here, a uniformed correctional officer might have given defendant a ticket (disciplinary report). Defendant consented to the interview.

Although Irvin knew that defendant was in segregation, he did not know that the segregation had been imposed as punishment for the "shanks" incident. Defendant was handcuffed and escorted to Irvin's office. Defendant's handcuffs were not removed until he returned to his cell.

Irvin's name and title were on the door of his office, which is in a group of offices connected to the cellhouse. The office contains a desk, three chairs, a credenza, and a filing cabinet. Irvin was dressed in civilian clothes, and was wearing a tag identifying him as an internal affairs official. No other prison personnel were in Irvin's office during the ensuing conversation. The guard who had escorted defendant waited outside the office door during the 10-minute interview.

The purpose of Irvin's interview was to discover whether defendant had possessed the shanks in order to

protect himself from enemies within the prison, and in that case whether defendant wanted to be placed in protective custody. Further, Irvin wished to determine whether defendant would have grounds for a "necessity" defense at a possible criminal trial. No charges had been filed against defendant at the time of this interview, and he was not given *Miranda* warnings prior to his conversation with Irvin.

It is the policy of investigators at Pontiac, following instructions from the State's Attorney of Livingston County, not to give *Miranda* warnings in interviews with inmates who have been found with "shanks" during a shakedown for weapons. The policy was put into effect after a prisoner brought a successful necessity defense to a charge of possession of a weapon while in the institution. Moreover, Irvin had found that inmates become "terrorized" after receiving *Miranda* warnings, and thus refuse to speak of their safety concerns.

During the interview, defendant declined protective custody, and stated that he had no enemies at Pontiac. Although he did not specifically mention a necessity defense, defendant did indicate that he would be inclined to possess a weapon because he had seen a friend stabbed at another prison. Irvin did not ask defendant whether he had a shank on the day of the shakedown, and defendant did not comment on the events of that day. After the interview, defendant was taken back to segregation.

On October 2, 1989, defendant was indicted for the offense of unlawful possession of weapons by a person confined in a Department facility in violation of section 24—1.1(b) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1(b)). This is a Class 1 felony offense, and could result in additional incarceration for a term of 4 to 15 years or an extended term of 15 to 20 years. The State later filed a second charge against

defendant, alleging possession of a weapon by a convicted felon in violation of section 24—1.1(a) of the Code. This charge is a Class 3 felony, carrying a potential prison term of 2 to 5 years, or an extended term of 5 to 10 years. Ill. Rev. Stat. 1989, ch. 38, pars. 24—1.1(a), (d), 1005—8—1(a)(6), 1005—8—2(a)(5).

On December 18, 1989, defendant filed a motion to suppress the statements made to Irvin, contending that their use was in violation of defendant's fifth amendment privilege against self-incrimination as defined in *Miranda*. The trial court heard evidence that defendant could have refused the interview with Irvin or could have terminated it at any time. However, the court was persuaded that *Miranda*-type warnings were required prior to the interview, because defendant had been identified as a primary suspect for an offense, and an investigation had focused on him. Thus, the court granted defendant's motion to suppress. The State appealed.

On appeal, the appellate court, with one justice dissenting, affirmed. The court found that defendant was interrogated while "in custody" for *Miranda* purposes. Consequently, the failure of prison authorities to give *Miranda*-type warnings rendered any statements by defendant inadmissible. The dissenting justice concluded that *Miranda* has no application to the interrogation of prison inmates.

We begin our analysis with a review of the standards set out in *Miranda*. In *Miranda*, the United States Supreme Court held that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, his fifth amendment privilege against self-incrimination is jeopardized. (U.S. Const., amend. V; *Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) Procedural safeguards must be put into effect to protect the privilege; the individual must be

warned prior to questioning that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to an attorney, and that if he cannot afford an attorney one will be provided for him prior to questioning if he so desires. (*Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) In the absence of a *Miranda* warning or waiver, no evidence obtained as a result of interrogation can be used against the individual. *Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.

The *Miranda* safeguards arose out of a concern that individuals interrogated while in custody might incriminate themselves due to physical or psychological coercion. (*Miranda*, 384 U.S. at 446-58, 16 L. Ed. 2d at 707-14, 86 S. Ct. at 1613-19.) The *Miranda* Court pointed out that the object of custodial interrogation is to subjugate the individual to the will of his examiner. The interrogation environment "carries its own badge of intimidation." (*Miranda*, 384 U.S. at 457, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.) Thus, unless adequate protective measures are employed to dispel the coercion inherent in the custodial environment, no statement obtained from the individual can truly be the product of his free choice. *Miranda*, 384 U.S. at 457, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.

*Miranda* safeguards become applicable as soon as a suspect's freedom of movement is curtailed to a " 'degree associated with formal arrest.' " (*Berkemer v. McCarty* (1984), 468 U.S. 420, 440, 82 L. Ed. 2d 317, 335, 104 S. Ct. 3138, 3150, quoting *California v. Beheler* (1983), 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279, 103 S. Ct. 3517, 3520.) In *Berkemer* the Court determined that a traffic stop does not exert sufficient pressure upon a detained person so as to impair the free exercise of his privilege against self-incrimination. The Court distinguished such a stop from a station house in-

terrogation, which frequently is prolonged, and in which the person interrogated feels completely at the mercy of the police. "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer*, 468 U.S. at 437, 82 L. Ed. 2d at 333, 104 S. Ct. at 3148-49.

*Miranda* is particularly applicable to situations where persons whose freedom has previously not been limited are taken into a highly restricted environment for questioning. (*Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 719.) However, the Supreme Court has also applied *Miranda* to situations where a prison inmate was questioned concerning a matter unrelated to the offense for which he was imprisoned.

In *Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503, the Court held that incriminating statements made to an Internal Revenue agent by a prison inmate were inadmissible. However, Federal courts interpreting *Mathis* have rejected the proposition that any interrogation during prison confinement constitutes custodial interrogation for *Miranda* purposes. To do so would "create a per se rule that *** could totally disrupt prison administration." (*Cervantes v. Walker* (9th Cir. 1978), 589 F.2d 424, 427.) Such a rule would torture *Miranda* "to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." (*Cervantes*, 589 F.2d at 427.) In *United States v. Conley* (4th Cir. 1985), 779 F.2d 970, 973, the court emphasized that nothing in *Miranda* suggests that an inmate is "in custody" and thus entitled to *Miranda* warnings merely by virtue of his prisoner status. To interpret the *Mathis* decision in such a way "would seriously disrupt prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad

informal conversations between inmates and prison guards which may touch on past or future criminal activity and which may yield potentially incriminating statements useful at trial." *Conley*, 779 F.2d at 973.

In *Baxter v. Palmigiano* (1976), 425 U.S. 308, 47 L. Ed. 2d 810, 96 S. Ct. 1551, the Court rejected the contention that, under *Miranda*, counsel must be provided at prison disciplinary hearings which are not part of a criminal prosecution. And, in a more recent ruling which further limits *Miranda*, the Court determined that a law enforcement officer posing as a fellow inmate was not required to give *Miranda* warnings to a suspect before asking questions that might have led to an incriminating response. (*Illinois v. Perkins* (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394.) In reaching its decision, the Court pointed out that the inmate had no reason to feel that the undercover agent had any legal authority to force him to answer questions or that the agent could affect the inmate's future treatment. Parenthetically, the Court remarked that "[t]he bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that issue here." *Perkins*, 496 U.S. at 299, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398.

The State contends that defendant was not "in custody" for *Miranda* purposes. Since a prisoner is never free to leave, to apply *Miranda* standards would be tantamount to a *per se* finding of custody for prison inmates. (*Cervantes*, 589 F.2d at 427.) The coercive effects that *Miranda* found to be associated with custodial interrogation arise in the prison context only if an inmate's liberty is limited beyond the usual conditions of his confinement. *Cervantes*, 589 F.2d at 427.

Defendant asserts that he was in custody when speaking with Irvin, as he had experienced a change of

circumstances which further limited his freedom of movement. Thus, we first address the question of whether defendant, while in Irvin's office, was "in custody," within the meaning of *Miranda*.

Custodial interrogation is questioning initiated by law enforcement officers after a person has been deprived of his freedom in any significant way. (*People v. Brown* (1990), 136 Ill. 2d 116, 124, citing *Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.) Federal courts have found that incarceration is not in itself custody. (*Cervantes*, 589 F.2d 424; *United States v. Cooper* (4th Cir. 1986), 800 F.2d 412; *Leviston v. Black* (8th Cir. 1988), 843 F.2d 302; *United States v. Rogers* (10th Cir. 1990), 899 F.2d 917.) The test in identifying police custody is whether there is a restraint on the defendant's freedom of movement of the degree associated with a formal arrest. *Brown*, 136 Ill. 2d at 124, citing *California v. Beheler* (1983), 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279, 103 S. Ct. 3517, 3520.

The determination of whether an interrogation is custodial requires an examination of all the circumstances surrounding the questioning. Among the factors to be considered are: the location, length, mood and mode of the interrogation; the number of police officers present; any evidence of restraint; and the intentions of the officers and focus of their investigation. (*People v. Lucas* (1989), 132 Ill. 2d 399, 417.) No single factor is determinative. (*People v. Fasse* (1988), 174 Ill. App. 3d 457, 461.) The trial court must examine and weigh these factors and then make an objective determination as to what a reasonable man would perceive if he were in the defendant's position. *Lucas*, 132 Ill. 2d at 417-18.

Defendant points out that his placement in segregation had limited his freedom of movement to the greatest extent possible within the prison. He was put in re-

straints whenever leaving his cell, and his handcuffs were not removed during the interview with Irvin.

Defendant's argument assumes that the limitation of freedom imposed on him by his segregation was a particular limitation on him at the time of his interview with Irvin. However, defendant had been in segregation for the two previous months. Thus, when he was taken to Irvin's office, defendant's freedom of movement was increased rather than further limited.

Defendant notes that inmates refer to their cells as their "homes." The inference is that, by being taken from his familiar cell to Irvin's unfamiliar office, defendant's freedom had been further limited, as is the case when a free man is taken from his home to the station house for questioning. However, defendant fails to consider that he could have requested to leave Irvin's office; he could not have requested to leave his cell had the questioning taken place there. Thus, in that sense, defendant's freedom was greater in the office than in his own cell.

Although defendant was escorted to the interview in restraints, his handcuffs did not place any greater burden on his freedom at that time than when he was taken in handcuffs to shower or exercise. The only factor relating to defendant's questioning which further limited his freedom of movement was that he remained in handcuffs during the interview. Irvin has testified that handcuffs are sometimes removed from prisoners whom he questions in his office. Defendant has not alleged, in response, that he asked for his handcuffs to be removed during the interview. In light of all the circumstances related above, we conclude that defendant's freedom of movement was not more severely restricted during the interview than it had been previously. Moreover, even where an individual is taken into custody, it is only when he is subjected to interro-

gation that *Miranda* protection must be provided. *Rhode Island v. Innis* (1979), 446 U.S. 291, 300, 64 L. Ed. 2d 297, 307, 100 S. Ct. 1682, 1689.

" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." (*Innis*, 446 U.S. at 300, 64 L. Ed. 2d at 307, 100 S. Ct. at 1689.) "Interrogation" under *Miranda* refers not only to express questioning but also to any words or actions on the part of police officers that they should know are reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90.

Defendant contends that Irvin, acting as an agent of the police, attempted to elicit incriminating statements from him as to whether defendant could mount a necessity defense to potential weapons charges. However, Irvin did not know at the time that any such charges were contemplated. Defendant acknowledges that the questions posed by Irvin were also designed to determine whether defendant wished or needed to be placed in protective custody. Nevertheless, defendant asserts that Irvin's motives were not benign.

Defendant's arguments are similar to those brought by the defendant in *Minnesota v. Murphy* (1984), 465 U.S. 420, 79 L. Ed. 2d 409, 104 S. Ct. 1136. *Murphy* was concerned with the admissibility in a subsequent criminal prosecution of statements made by a probationer to his probation officer. The Court found that the mere fact that the probation officer could compel the probationer's attendance and truthful answers did not transform a routine interview into an inherently coercive setting. (*Murphy*, 465 U.S. at 431, 79 L. Ed. 2d at 422, 104 S. Ct. at 1144.) In answer to the probationer's objection that the probation officer consciously sought incriminating evidence, the Court emphasized

that this factor does not give rise to a self-executing privilege; police officers questioning persons suspected of crimes often seek incriminating statements. (*Murphy*, 465 U.S. at 431, 79 L. Ed. 2d at 422, 104 S. Ct. at 1144.) When the probationer protested that he was unprepared for the officer's questions and should have been represented by counsel, the Court likened the situation to the questioning of grand jury witnesses who are unaware of the scope of an investigation or of the fact that they are considered potential defendants. A reasonable person should have expected that his answers could incriminate him. *Murphy*, 465 U.S. at 432, 79 L. Ed. 2d at 422, 104 S. Ct. at 1144-45.

Here, defendant, like the probationer in *Murphy*, does not deny that Irvin's questions were legitimately related to defendant's needs. Moreover, defendant, like the probationer, was not led to believe that his questioning would continue until some sort of confession was obtained. The Supreme Court found that the probationer's statements were not coerced. Applying the Court's criteria to this case, we find that defendant similarly was not coerced in making his statements to Irvin.

The purpose of Irvin's questioning was to determine whether defendant's possession of the shanks was in response to fear of an attack by fellow inmates. Thus, Irvin restricted his questioning to inquiries about defendant's safety concerns. He did not try to elicit any incriminating response from defendant. That defendant's answers were later released to the State's Attorney for use at trial does not in itself demonstrate that the questioning was within the scope of *Miranda* protection.

Further, Irvin's office was not an inherently coercive environment. No police officers were present during the interview, and Irvin was not wearing a uni-

form. Although defendant could have received a ticket for refusing to speak with Irvin, as he could have been given a ticket for any refusal to comply with orders given by a guard, Irvin himself had no power to impose such a disciplinary measure. Moreover, there is no indication in the record that tickets had ever been written in similar circumstances.

Irvin spoke with defendant for only 10 minutes. During the 10-minute interview, Irvin put no physical or psychological pressure on defendant to answer in one way or another. A reasonable man in defendant's position would not have thought that his will was being subjugated to that of his questioner.

After examining all the factors noted above, we find that defendant was not "in custody," and was not coerced into incriminating himself during his interview with Irvin. Because there was no coercion, the concerns underlying *Miranda* are not implicated in this case. Thus, defendant's statements should have been admitted at trial.

A court of review should leave in place the trial court's ruling on a motion to suppress unless it is manifestly erroneous. (*People v. Brown* (1990), 136 Ill. 2d 116, 125.) Here, the trial court found that defendant was entitled to *Miranda* warnings because he was the primary suspect and an investigation had focused on him. It is the element of coercion rather than the mere focus of an investigation that calls *Miranda* safeguards into play. (*Beckwith v. United States* (1976), 425 U.S. 341, 347, 48 L. Ed. 2d 1, 8, 96 S. Ct. 1612, 1616.) Thus, finding the circuit court's ruling to be manifestly erroneous, we reverse.

The appellate court rejected the reasoning of the circuit court, but affirmed its ruling on the grounds that defendant was interrogated while in custody. Because we find that defendant did not experience the

sort of custodial interrogation contemplated by *Miranda,* we reverse the judgments of the appellate and circuit courts, and remand the cause to the circuit court for proceedings consistent with this opinion.

> *Appellate court reversed;*
> *circuit court reversed;*
> *cause remanded.*

JUSTICE HEIPLE, specially concurring:

This case raises the issue of whether a prison inmate must be given *Miranda* warnings prior to interviews with prison officials who are investigating security matters within the prison. The majority opinion concludes that since defendant was not "in custody," and was not coerced into incriminating himself, the concerns underlying *Miranda* are not implicated, and thus, defendant did not have a right to *Miranda* warnings.

The *Miranda* warnings arose out of a concern for the inherent ·coerciveness which exists in situations where suspects, previously at liberty, are cut off from the outside world and placed in an antagonistic police-dominated environment. (*Miranda v. Arizona* (1966), 384 U.S. 436, 457-58, 16 L. Ed. 2d 694, 714, 86 S. Ct. 1602, 1619.) These concerns are not present in situations where an individual is already serving a sentence in a State penitentiary. Appellate Justice Steigmann, dissenting in the cause below (207 Ill. App. 3d 104, 116-22 (Steigmann, J., dissenting)), carefully, fully, and accurately analyzes the goals and objectives of *Miranda* warnings. He concludes that *Miranda* has no application to the interrogation of prison inmates. I concur and fully endorse the reasoning set forth in Justice Steigmann's well-written dissent.

Since it is my belief that *Miranda* does not, and should not, apply to the interrogation of prison inmates, I agree that the trial and appellate courts erroneously

suppressed defendant's statements and that reversal is indicated. Accordingly, I specially concur with the result reached by the majority opinion in this case.

JUSTICE BILANDIC joins in this special concurrence.

JUSTICE FREEMAN, dissenting:

The majority concludes that under the circumstances of this case, *Miranda* warnings were not required. The majority reaches this conclusion by determining that the defendant was not subjected to custodial interrogation. I believe this conclusion to be clearly erroneous. Therefore, I dissent.

The procedural safeguards of *Miranda* warnings did not develop in contemplation of the prison inmate being questioned concerning an offense during his incarceration. They developed, instead, in response to the need to protect fifth amendment rights of persons previously at liberty, cut off from the outside world, and placed in a police-dominated environment. (See *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Thus, the traditional *Miranda* formulation does not lend itself to easy application in prisoner interrogation cases.

Despite his prisoner status, the prison inmate is just as susceptible to compelled self-incrimination as is the person taken off the street. Although I recognize that *Miranda* clearly is not implicated in every prison inmate interrogation situation (see, *e.g., Illinois v. Perkins* (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394), nevertheless, the inmate, like his unincarcerated counterpart, may be subjected to criminal penalty based upon his incriminating statements. Therefore, I remain firm in my conviction that the prison inmate's fifth amendment rights should be no less vigorously protected.

In order for *Miranda* warnings to be required, the suspect must be in custody. Given the peculiar nature of the prison setting, every inmate is literally "in custody." Thus, it is apparent that the test for *Miranda* in the prison setting requires that some special attention be given to the particular circumstance of each case. The relevant inquiry is whether a reasonable person in the inmate's position would have understood himself to be in custody. *Leviston v. Black* (8th Cir. 1988), 843 F.2d 302, 304.

As the court in *Cervantes v. Walker* (9th Cir. 1978), 589 F.2d 424, 428, noted, restriction, with regard to a person's liberty, is a relative concept, one not determined exclusively by the lack of freedom to leave. In the prison setting, restriction necessarily implies a change in the surroundings of the prison inmate, greater than that already existing in the prison environment, which results in an added imposition on his freedom of movement. To determine whether *Miranda* warnings are implicated, it is necessary, then, to look to some act which places further limitations on the prison inmate. *Cervantes* further noted that this approach best reconciles *Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503, with the principles of *Miranda*.

The *Cervantes* court reasoned that, in *Mathis*, the questioning of the defendant by a government agent, not himself a member of the prison staff, on a matter not under investigation within the prison itself, may be said to have constituted an additional imposition on the defendant's limited freedom of movement, requiring *Miranda* warnings. *Cervantes*, 589 F.2d at 428.

A similar conclusion results by application of the *Cervantes* analysis to the facts here. Defendant was questioned by an investigator, not the prison warden or a counselor, whose primary duty was to investigate incidents and prepare cases for prosecution. The interview,

while conducted in part for security purposes, also served an additional purpose of determining whether defendant would have a necessity defense available in the event of his prosecution. Thus, this investigation, like the investigation in *Mathis*, could also be viewed as having constituted an additional imposition on defendant's limited freedom of movement, necessitating *Miranda* warnings.

The majority considers the physical aspects of defendant's restriction, and concludes that he was not in custody for purposes of *Miranda* because his "freedom of movement was not more severely restricted during the interview than it had been previously." (146 Ill. 2d at 455; see also *Cervantes*, 589 F.2d at 428.) In applying the *Cervantes* test, the majority acknowledges that a further limiting restriction was posed because defendant remained handcuffed during the interview with Irvin. However, the majority then apparently discounts the relevance of this fact on the basis that defendant did not ask to have the handcuffs removed.

I believe, as the majority finds, that defendant was further restricted as a result of the continued handcuffing. However, unlike the majority, I do not believe that defendant's perceived acquiescence in being so restricted negates the fact of that restriction. The majority places great stock in the fact that defendant did not request to have the handcuffs removed. From this fact, the majority seems to infer that defendant felt unrestricted. I note with equal vigor that there is no mention in the majority's discussion that Irvin ever offered to have the cuffs removed. Yet the majority does not then suggest that the absence of such an invitation contributed to defendant's restriction.

Moreover, Irvin testified that handcuffs are sometimes removed from prisoners whom he questions in his office. This fact supports a finding that since defendant's

handcuffs were not removed, he was further restricted, not only in relation to the prison population as a whole, but in relation to those other inmates whose handcuffs are removed during an interview with Irvin.

Additionally, defendant posited the argument that he was further restricted during the interview than if he had remained at "home," in his cell. The majority's response is that defendant failed to consider that, while defendant could have requested to leave Irvin's office, he could not have requested to leave his cell.

I agree with defendant. At least while in his cell, defendant was not handcuffed. However, once he was taken inside the interview room, he was deprived, not only of his normal freedom of movement within the prison setting, but also of the familiarity of his jail cell.

Further, the majority overlooks the potential consequence of defendant's request to leave the interview. Any thought given by defendant to request leave would naturally have been tempered by his knowledge of the potential consequence of such conduct. Absent advice from Irvin or a belief by defendant that he could leave without threat or fear of punishment for his failure to cooperate, the fact that he could request to leave had no diminishing effect on defendant's compelled presence at the interview.

The questioning here took place in a context where defendant's freedom to depart was restricted. (See *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 91 S. Ct. 711.) Thus, I believe that a reasonable person in defendant's position would have understood himself to be in custody.

The majority next concludes that defendant was not interrogated, as that term is understood for *Miranda* purposes. It rejects defendant's contention that Irvin attempted to elicit incriminating statements from defendant as to whether defendant would mount a necessity de-

fense to a potential weapons charge. It concludes, instead, that the purpose of Irvin's questioning was to determine whether defendant's possession of the shanks was in response to fear of an attack by fellow inmates. The majority views Irvin's questioning as having been limited to inquiries regarding safety concerns.

I note that Irvin had been instructed by the State's Attorney not to give *Miranda* warnings to prison inmates being investigated in shank cases. Further, I note that, subsequent to the interview, criminal charges were filed against defendant. I am not persuaded that Irvin's questions were as innocuous as the majority perceives. Irvin's questions to defendant regarding safety were the functional equivalent of questions concerning the availability of a necessity defense. Even though his questions may have been framed in terms of safety concerns, they, nonetheless, elicited the incriminating responses regarding the necessity defense.

Moreover, application of *Miranda* warnings is not dependent upon the reason the questions were asked at the time. (See *Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503.) The fact that the primary purpose of the questioning here was related to safety concerns for defendant is not determinative on the issue of when the *Miranda* interrogation occurred. See *Mathis*, 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (fact that questions were asked as part of a routine tax investigation where no criminal proceedings might even be brought did not negate *Miranda* requirement since tax investigations frequently lead to criminal prosecutions).

As Professor Kamisar has stated:

"[S]o long as the police conduct is likely to elicit incriminating statements and thus endanger the privilege, it is police 'interrogation,' *regardless of its primary purpose or motivation*, and that if it otherwise qualifies as 'inter-

rogation,' it *does not become something else* because the interrogator's main purpose is [something other] than the procuring of incriminating statements, even though self-incrimination may be foreseen as a windfall." (Emphasis in original.) Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When does it Matter?*, 67 Georgetown L.J. 1, 9 (1978).

Defendant was subjected to words which Irvin should have known were reasonably likely to elicit testimony by defendant against himself. Thus, the duality of purpose in Irvin's interview of defendant did not serve to preclude the necessity of *Miranda* warnings. Additionally, I believe that Irvin's attempt to determine the availability of a necessity defense belies any claimed unawareness that criminal charges were contemplated.

Finally, the majority attempts to accommodate its decision within the confines of *Miranda* by concluding that Irvin's office was not an inherently coercive environment. It supports this conclusion on the basis that no police officers were present during the interview; Irvin was not wearing a uniform at the time of the interview; Irvin had no power to impose any disciplinary measure; and the interview lasted 10 minutes.

I am not persuaded that these facts had any transformative effect on defendant's perception of the coercive nature of the interview process. There is no suggestion that defendant was unaware of Irvin's position and authority. Thus, the fact that Irvin was not in uniform made him no less an investigator in defendant's eyes. Further, I cannot believe that defendant would feel any less compelled to cooperate because Irvin would not himself mete out the punishment for defendant's uncooperative conduct.

Arguably, there are some facts, for example, the absence of police during the interview, which might tend to support a finding that *Miranda* was not implicated.

However, on the whole, the facts that: (1) defendant was restricted during the interview to a greater extent than he was while in his prison cell; (2) defendant could have been penalized for his failure to cooperate; (3) Irvin was an investigator who had a primary duty to prepare cases for prosecution; (4) Irvin took direction in investigating shank cases from the prosecuting arm of the State; and (5) defendant was indirectly questioned about a necessity defense, strongly support the opposite conclusion. Under these circumstances, defendant had sufficient reason to feel that Irvin had legal authority to compel him to be present at the interview and to answer questions; and that Irvin, whether directly or indirectly, could affect the defendant's future treatment. Compare *Illinois v. Perkins* (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394.

Necessarily, prison inmates must surrender some of their constitutional rights in order to permit proper prison administration and discipline. Notwithstanding this concern, the fifth amendment guarantee against compulsory self-incrimination must be carefully guarded and must not be unnecessarily compromised by the needs of penal administration.

For the reasons stated, I would affirm the lower courts' decisions that *Miranda* warnings were required.

JUSTICE CLARK joins in this dissent.