# Illinois Official Reports

## Supreme Court

*People v. Smith*, 2016 IL 119659

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MATTHEW SMITH, Appellee. |
| Docket No. | 119659 |
| Filed | December 30, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Livingston County, the Hon. Jennifer Bauknecht, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part, reversed in part. Circuit court judgment affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Seth Uphoff, State's Attorney, of Pontiac (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Jason F. Krigel, Assistant Attorneys General, and Patrick Delfino, David J. Robinson, and Luke McNeill, of the Office of the State's Attorneys Appellate Prosecutor, of counsel), for the People. <br><br> Steven F. Pflaum and Andrew G. May, of Neal, Gerber & Eisenberg LLP, of Chicago, for appellee. |

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Kilbride, Garman, and Theis concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justice Burke.

**OPINION**

¶ 1     Defendant, Matthew Smith, was charged by indictment with aggravated battery of a corrections officer, a Class 2 felony (720 ILCS 5/12-3.05(d)(4)(i), (h) (West 2010)). Following a jury trial in the Livingston County circuit court, defendant was found guilty. Defendant was sentenced as a Class X offender to six years in the Department of Corrections. The appellate court affirmed defendant's conviction but vacated defendant's sentence and remanded for a new sentencing hearing, holding that defendant was not eligible for Class X sentencing. 2015 IL App (4th) 130453-U. This court granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 2                                         BACKGROUND

¶ 3     The indictment against defendant was filed on January 20, 2012. The indictment alleged that on September 2, 2011, defendant, in committing a battery, "knowingly made physical contact of an insulting or provoking nature with Correctional Officer Jody Davis, in that the defendant threw an unknown liquid substance on Jody Davis striking him about the body, knowing Jody Davis to be a correctional institution employee of the State of Illinois Department of Corrections, who was engaged in the performance of his authorized duties." On January 24, 2012, the State filed its notice that defendant was eligible for mandatory Class X sentencing pursuant to the Unified Code of Corrections (730 ILCS 5/5-4.5-95(b) (West 2010)), should defendant be convicted of the Class 2 felony of aggravated battery.

¶ 4     In April 2012, following questioning and admonishment by the court, defendant waived his right to counsel and elected to proceed *pro se*. Defendant then filed several motions, including a motion to suppress an incriminating statement that he made to corrections officer Robert Snyder. Following a hearing on August 22, 2012, the trial court denied defendant's motion to suppress.

¶ 5     A jury trial was held on April 19, 2013, where defendant continued to appear *pro se*. Although there are no issues before this court concerning defendant's trial, we will briefly set forth some of the trial testimony in order to provide some background information.

¶ 6     Officer Jody Davis testified that on September 2, 2011, he was in uniform working as a correctional officer at Pontiac Correctional Center. Around 1:40 p.m. that day, Davis was doing shower duty for his gallery. Davis explained that once a week, the inmates in segregation are allowed to shower. Davis would go down the gallery, take the prisoners out and handcuff them, then take them to the showers. The doors of the cells on the gallery are perforated. Defendant was housed alone in cell 305 on the gallery. While Davis was talking with the inmate in cell 304, next door to the defendant, Davis was hit with a liquid substance all over the

side of his body. Davis testified that the liquid came from defendant's cell. Davis could not tell what the substance was. After being hit with the liquid, Davis informed his cell house lieutenant, who directed Davis to go the health care unit to be evaluated.

¶ 7 Robert Snyder also testified at defendant's trial that he was a correctional officer at Pontiac Correctional Center assigned to the Internal Affairs Unit. Officer Snyder investigated the incident between Davis and defendant. Officer Snyder interviewed defendant on September 9, 2011. Officer Snyder asked defendant if he threw a liquid substance on Davis. Defendant responded that he did. When Officer Snyder asked why he threw the liquid, defendant said he did it because Davis did not give defendant his weekly shower. Defendant never identified the liquid substance. As noted, a jury found defendant guilty.

¶ 8 Defendant then appealed, arguing that the trial court erred by (1) improperly admonishing him regarding his waiver of counsel, (2) denying his motion to suppress his confession, and (3) sentencing him as a Class X offender. The appellate court rejected defendant's claim that the trial court's admonishments regarding waiver of counsel were insufficient. 2015 IL App (4th) 130453-U, ¶ 32. The appellate court also found that the trial court did not err in denying defendant's motion to suppress his statements to Officer Snyder. *Id.* ¶ 42. However, the appellate court found that the trial court erred in sentencing defendant as a Class X offender. *Id.* ¶ 44. The appellate court held that defendant was not eligible for Class X sentencing because he was not 21 at the time he was charged with the offense at issue. *Id.* The appellate court therefore vacated defendant's sentence and remanded the case for a new sentencing hearing.

¶ 9 The State now appeals the appellate court's finding that the trial court erred in sentencing defendant as a Class X offender. Defendant has requested cross-relief concerning the trial court's order denying his motion to suppress.

¶ 10                                                          ANALYSIS

¶ 11 We first address the issue raised in the State's petition for leave to appeal: whether the appellate court erred in vacating defendant's Class X sentence. Section 5-4.5-95(b) of the Unified Code of Corrections (Code), the statute at issue, provides:

> "(b) When a defendant, over the age of 21 years, is convicted of a Class 1 or Class 2 felony, after having twice been convicted in any state or federal court of an offense that contains the same elements as an offense now (the date the Class 1 or Class 2 felony was committed) classified in Illinois as a Class 2 or greater Class felony and those charges are separately brought and tried and arise out of different series of acts, that defendant shall be sentenced as a Class X offender. This subsection does not apply unless:
>
>> (1) the first felony was committed after February 1, 1978 (the effective date of Public Act 80-1099);
>>
>> (2) the second felony was committed after conviction on the first; and
>>
>> (3) the third felony was committed after conviction on the second." 730 ILCS 5/5-4.5-95(b) (West 2010).

¶ 12 The parties do not dispute that defendant had two prior qualifying convictions, including an October 2007 conviction for aggravated criminal sexual assault with a weapon, a Class X felony, and a June 2010 conviction for bringing a weapon into a penal institution, a Class 1

felony. The parties disagree concerning when a defendant must reach the age of 21 in order to be eligible for mandatory Class X sentencing.

¶ 13     Defendant was born on September 24, 1991, so he was 19 years old at the time the offense at issue was committed, was 20 years old when he was indicted, and was 21 years old at the time of trial and sentencing. The appellate court held that the relevant time period for purposes of section 5-4.5-95(b) was defendant's age at the time he was charged with the offense at issue. Accordingly, because defendant in this case was 20 years old when he was indicted, he was not eligible for mandatory Class X sentencing pursuant to the statute.

¶ 14     The State argues that the appellate court erred in vacating defendant's sentence, contending that the relevant time period for purposes of the statute is a defendant's age at the time he is convicted. Because defendant was 21 years old when he was convicted, the trial court properly sentenced defendant pursuant to section 5-4.5-95(b).

¶ 15     Because this issue involves a question of statutory interpretation, our review is *de novo*. *People v. Chenoweth*, 2015 IL 116898, ¶ 20.

¶ 16     As the State observes, at the time defendant was convicted and sentenced, the only decisions addressing when a defendant must reach the age of 21 for purposes of section 5-4.5-95(b) uniformly held that a defendant must be 21 at the time of conviction. These decisions were all from the First District of the appellate court.

¶ 17     In *People v. Baaree*, 315 Ill. App. 3d 1049 (2000), the defendant was 20 years old at the time of his arrest, and at the time his guilty verdict was rendered, but had turned 21 years old by the time of his sentencing. The trial court sentenced the defendant to mandatory Class X sentencing pursuant to section 5-5-3(c)(8) of the Code (730 ILCS 5/5-5-3(c)(8) (West 1998) (now 730 ILCS 5/5-4.5-95(b) (West 2010))). *Baaree*, 315 Ill. App. 3d at 1050. On appeal, the defendant argued that the term "convicted" in the statute could be construed as referring to the time the court determined his guilt rather than the time the sentence was imposed.

¶ 18     The *Baaree* court held that a plain reading of the statute indicated that a defendant's age at the time of conviction is the deciding factor in determining whether the mandatory Class X sentencing statute would apply. *Id.* at 1050. The court then addressed what was meant by the term "convicted," noting that it could mean the time sentenced is imposed or it could mean the time a defendant is found guilty. *Id.* at 1052. The court found the term "convicted" in section 5-5-3(c)(8) was ambiguous and therefore adopted a construction favoring the defendant, holding that the defendant was convicted for purposes of section 5-5-3(c)(8) when he was adjudicated guilty by the trial court. *Id.* at 1052-53.

¶ 19     Following *Baaree*, the appellate court in *People v. Williams*, 358 Ill. App. 3d 363 (2005), addressed the defendant's claim that the *Baaree* decision should be taken one step further to interpret section 5-5-3(c)(8) as being triggered when the defendant is over the age of 21 at the time the charged offense is committed. The defendant in that case claimed that the statute was ambiguous concerning whether the age requirement pertained to when the accused became a "defendant" or when the accused is "convicted." *Id.* at 365.

¶ 20     The *Williams* court rejected that claim, holding that *Baaree* resolved any ambiguity in section 5-5-3(c)(8) when it determined that "convicted" referred to the adjudication of guilt and not to sentencing. *Id.* at 366. The *Williams* court further found that "the *Baaree* court also impliedly resolved the issue that defendant" raised in the case before it, when *Baaree* held that a defendant's age at the time of conviction is the deciding factor in determining whether the

statute will apply. *Id.* Therefore, the statute's reference to a defendant over the age of 21 refers to the time at which a defendant is convicted or adjudicated guilty and not to a time when the offense was committed. *Id.*

¶ 21    In *People v. Stokes*, 392 Ill. App. 3d 335 (2009), the defendant again argued that section 5-5-3(c)(8) applied only if a defendant is 21 or older at the time the offense is committed. Citing *Baaree* and *Williams*, the appellate court rejected that claim, holding that because the defendant turned 21 prior to the start of his trial and, thus, was 21 years old at the time he was convicted or adjudicated guilty, the defendant was subject to the mandatory Class X sentencing provisions of section 5-5-3(c)(8). *Id.* at 344.

¶ 22    While defendant's appeal in the instant case was pending, the appellate court in *People v. Douglas*, 2014 IL App (4th) 120617, disagreed with the preceding cases and held that a defendant's eligibility for Class X sentencing pursuant to section 5-5-3(c)(8) depended upon his age at the time he is charged, rather than his age at the time of conviction. The *Douglas* court stated that the defendant in *Baaree* did not make the same argument as the defendants in *Williams*, *Stokes*, and the case before it. *Id.* ¶ 23. The defendant in *Baaree* had argued that the term "convicted" in section 5-5-3(c)(8) could refer to either the date he was found guilty or the date he was sentenced. *Id.* ¶ 25. In contrast, the defendants in *Williams*, *Stokes*, and *Douglas* had argued that section 5-5-3(c)(8) did not apply because they were under 21 when the offense at issue was committed and charged. *Id.* ¶ 23. The *Douglas* court held that because the *Baaree* court did not address whether a defendant must be 21 years old at the time he committed the offense or was charged with the offense, the decisions in *Baaree*, *Williams*, and *Stokes* were not persuasive concerning the issue before it. *Id.* ¶ 26.

¶ 23    In its analysis, the *Douglas* court noted that the definition of "defendant" in the Code is "a person charged with an offense." *Id.* ¶ 28 (quoting 730 ILCS 5/5-1-7 (West 2008)). The court then replaced the word "defendant" in the statute with its definition, so that the statute would read: " 'When a [person charged with an offense], over the age of 21 years, is convicted ***.' " *Id.* ¶ 29 (quoting 730 ILCS 5/5-5-3(c)(8) (West 2008)). According to the court, when read in that manner, the key point in time was no longer the date of conviction but rather the date the individual is charged with an offense. *Id.* The court concluded that the statute was ambiguous and held that the rule of lenity required it to resolve any ambiguity in favor of the accused. *Id.* ¶ 30. Interpreting the statute in favor of the defendant would place the date for determining a defendant's age for purposes of section 5-5-3(c)(8) as the date on which he was charged, not the date on which he was convicted. *Id.*

¶ 24    In vacating defendant's sentence in this case, the appellate court relied on the *Douglas* decision. 2015 IL App (4th) 130453-U, ¶ 25. The appellate court acknowledged the decisions in *Baaree*, *Williams*, and *Stokes* but was not persuaded to depart from the reasoning in *Douglas*.

¶ 25    Following *Douglas*, the First District of the appellate court again addressed whether a defendant must be over the age of 21 when he commits or is charged with an offense in order to be eligible for sentencing under section 5-4.5-95(b). *People v. Brown*, 2015 IL App (1st) 140508. The *Brown* court, with one justice dissenting, acknowledged the conflict between the decisions in *Baaree*, *Williams*, *Stokes*, and *Douglas* and found the reasoning of *Douglas* persuasive. *Id.* ¶ 13. *Brown* concluded that the statute was ambiguous regarding whether a defendant's age should be considered at the time an offense is committed, at the time the

- 5 -

offense is charged, or at the time the defendant is convicted. *Id.* ¶ 16. Therefore, the *Brown* court applied the rule of lenity and interpreted the statute in favor of the defendant, holding that because the defendant was under the age of 21 when he was charged with the offense at issue, he was ineligible for Class X sentencing under section 5-4.5-95(b). *Id.*

¶ 26 The dissent in *Brown* stated that the determination at issue was at which time a defendant must be over the age of 21, not the time at which an individual becomes a defendant. *Id.* ¶ 22 (Lavin, J., dissenting). Adding the definition of "defendant" into the statute, as the *Douglas* court did, was not inappropriate but did not support the *Douglas* court's reading of the statute. *Id.* ¶ 27. The dissent noted:

> "While a person must be charged with an offense in order to be a defendant, it does not follow that a defendant ceases to be a defendant the moment after he is charged. The defendant before us, as well as the defendant in *Douglas*, continued to be a defendant long after he was charged. Even at sentencing, a defendant is a person who has been charged with an offense. In short, the word 'defendant' does not identify the time of an event; rather, it identifies a person's status. Additionally, *Douglas*'s reading of the statute would render meaningless the word 'convicted.' In contrast, reading the statute as a whole, as we must, the statute clearly requires the defendant to be 21 years old when convicted. If the legislature had intended the statute to read, 'when a defendant over the age of 21 years, *is charged*,' the legislature very well could have written the statute that way but it is not the appellate court's place to rewrite it. Because the statute is not ambiguous in the specific manner that defendant suggests, we cannot *mis*construe the statute in favor of the accused." (Emphasis in original.) *Id.*

¶ 27 We find the *Brown* dissent to be well taken. It is well settled that this court's primary objective in construing a statute is to give effect to the intent of the legislature. *People v. Chenoweth*, 2015 IL 116898, ¶ 21. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *Id.* A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *Id.* Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. *Id.* This court will not depart from a statute's plain language by reading into it exceptions, limitations, or conditions that the legislature did not express. *In re J.L.*, 236 Ill. 2d 329, 339 (2010). Where the statutory language is clear and unambiguous, it will be given effect as written, without resort to other aids of construction. *Id.*

¶ 28 We find the language of section 5-4.5-95(b) is clear and unambiguous with regard to the issue before us. The statute makes no reference to the defendant's age at the time the offense is committed or the time that the offense is charged. The statute clearly provides that mandatory Class X sentencing applies when a defendant, over the age of 21, *is convicted*. As the State has argued, the appellate court's interpretation of the statute would add additional language to the statute, providing that the statute applies when a defendant, over the age of 21 *at the time the crime is charged*, is convicted. No rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may we rewrite a statute to add provisions or limitations the legislature did not include. *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 28.

¶ 29　　Moreover, as the State points out, in other sentencing provisions under the Code, the legislature has specifically provided that a court should consider a defendant's age at an earlier time than conviction. Thus, section 5-5-3.2(b)(7) of the Code provides that a court may consider imposing an extended term sentence "[w]hen a *defendant who was at least 17 years of age at the time of the commission of the offense is convicted* of a felony." (Emphasis added.) 730 ILCS 5/5-5-3.2(b)(7) (West 2010). Likewise, section 5-8-1(a)(1)(c)(ii) of the Code states that a defendant shall be sentenced to a term of natural life imprisonment if the defendant "is a person who, *at the time of the commission of the murder, had attained the age of 17 or more* and is found guilty of murdering an individual under 12 years of age; or *irrespective of the defendant's age at the time of the commission of the offense*, is found guilty of murdering more than one victim." (Emphases added.) 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2010).

¶ 30　　In contrast to the preceding sections of the Code, the legislature included no reference in section 5-4.5-95(b) to the defendant's age at the time he committed the offense or at the time he is charged with the offense. It is well settled that where the legislature includes particular language in one section of a statute but omits it in another section of the same statute, courts will presume that the legislature acted intentionally in the exclusion or inclusion. *In re C.C.*, 2011 IL 111795, ¶ 35. Therefore, absent an express reference to a defendant's age at a time prior to conviction, it would be inappropriate for this court to infer that the legislature intended section 5-4.5-95(b) to also include a condition that the defendant must have attained the age of 21 at the time he committed the offense or at the time he is charged with the offense.

¶ 31　　The plain language of the statute provides that a defendant must be 21 years old when he is convicted in order to be eligible for Class X sentencing under section 5-4.5-95(b). Here, defendant was 21 years old when he was convicted, so the trial court properly sentenced defendant as a Class X offender pursuant to section 5-4.5-95(b). We further note that defendant was 21 years old both when he was found guilty and when he was sentenced, so we need not consider whether the *Baaree* court properly held that a defendant is convicted for purposes of section 5-4.5-95(b) when he is found guilty. The appellate court erred in vacating defendant's sentence and remanding for a new sentencing hearing. Accordingly, we reverse that portion of the appellate court's order and affirm the trial court's sentence.

¶ 32　　We now turn to defendant's request for cross-relief. In his request for cross-relief, defendant argues that the trial court erred in denying his motion to suppress. The facts concerning defendant's motion to suppress are as follows.

¶ 33　　Defendant's *pro se* motion to suppress argued that his admission to assaulting Officer Davis should be suppressed because he was not read his *Miranda* rights prior to giving his statement. The State's sole witness at the hearing on defendant's motion to suppress was Robert Snyder. Officer Snyder testified that he is an investigator for the Internal Affairs Unit of Pontiac Correctional Center. Officer Snyder interviewed defendant on September 9, 2011, concerning the assault case. At the time, defendant was housed in the north segregation unit of the correctional center. The north segregation unit is the most restrictive place in the prison. Prisoners in the segregation unit are housed in single cells with solid or perforated doors. They are not allowed to go into the yard with other individuals. At the time Officer Snyder interviewed defendant, defendant was housed in cell 305, which had a perforated front, meaning that there were dime-sized holes through the cell door.

¶ 34        Officer Snyder testified that his interview with defendant took place in the counselor's room in the north segregation unit, which is a small room with a desk, two chairs, and fluorescent lights. Officer Snyder was wearing a uniform when he interviewed defendant. No one else was in the room when the interview took place. Defendant was handcuffed when he was in the interview room. Officer Snyder explained that when a prisoner in the segregation unit is taken from his cell to any other place in the prison, such as to the shower or to the exercise area, the prisoner is in handcuffs. The interview with defendant was not very long and was closer to 10 minutes than 30 minutes. Officer Snyder did not read defendant his *Miranda* rights before interviewing him.

¶ 35        Officer Snyder testified that an interview like his interview of defendant is in the course of a normal investigation. The inmate is given a chance to give a statement and tell the inmate's side of what happened. Officer Snyder said that he wanted to find out what had been thrown on Officer Davis, for the safety of Officer Davis. At the time of the interview, Officer Snyder knew that defendant was going to receive an offender disciplinary report, or a "ticket," but was not aware of any possible charges outside of prison. If an inmate commits a violation of the correctional center rules, the inmate is charged through the Illinois Department of Corrections with an offender disciplinary report. Officer Snyder said that he did not tell defendant that he could not leave unless he confessed, nor did he put any pressure on defendant to answer in a certain way. Officer Snyder said it was just an interview and defendant was free to leave at any time.

¶ 36        On cross-examination, Officer Snyder clarified that his interview with defendant took place at the health care holding tank. Defendant did not present any witnesses or testify in support of his motion to suppress.

¶ 37        The trial court denied defendant's motion to suppress. The trial court found that the interaction between Officer Snyder and defendant was an investigation, not an interrogation. Defendant was not placed in a more restrictive setting, which would elevate the interview into some type of interrogation. In fact, the interview took place in a less restrictive setting than the segregation unit in which defendant was housed. The trial court found by a preponderance of the evidence that the interview was an investigation, so *Miranda* warnings were not required.

¶ 38        On appeal, the court noted that defendant had failed to preserve the issue by filing a posttrial motion. 2015 IL App (4th) 130453-U, ¶ 34. To preserve an alleged error for review, a defendant must raise a timely objection at trial and raise the error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, in a criminal case, an issue that is not properly preserved may be raised on appeal pursuant to Illinois Supreme Court Rule 615(a), which provides:

            "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

¶ 39        Under the plain error doctrine, a reviewing court may address a forfeited claim in two circumstances. The court may address the claim "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the

- 8 -

evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48. In applying the plain error doctrine, it is first appropriate to determine whether error occurred, because absent reversible error, there can be no plain error. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). Accordingly, the appellate court first addressed whether error occurred in this case.

¶ 40    The appellate court noted that the need for *Miranda* warnings is triggered when the accused is both in custody and is subjected to interrogation. Although the trial court found that the interaction between Officer Snyder and defendant was an investigation, not an interrogation, the parties did not dispute that defendant was subject to interrogation when addressing the issue in the appellate court. 2015 IL App (4th) 130453-U, ¶ 36. Consequently, the issue before the appellate court was whether defendant was in custody when he made his statements to Officer Snyder. *Id.* The appellate court found, based upon the totality of circumstances, that defendant was not subject to a custodial interrogation that would otherwise require the constitutional safeguards of *Miranda*. *Id.* ¶ 42.

¶ 41    In support of its finding, the appellate court noted that defendant was housed in the most restrictive area of the prison—the segregation unit. Officer Snyder transferred defendant to the interview room in the health care unit, which contained a desk, two chairs, and fluorescent lighting. Defendant wore handcuffs, as he would if he were being transferred to the showers or for exercise, and defendant did not request the removal of the handcuffs. The interview was brief—10 minutes. The appellate court rejected defendant's claim that Officer Snyder's failure to remove his handcuffs demonstrated that defendant was in custody. The appellate court pointed out that Officer Snyder was alone in interviewing defendant regarding his alleged battery of another officer, so restraining defendant was reasonable in light of the safety risk to Officer Snyder. In addition, although defendant claimed his statement was obtained coercively because he would have faced disciplinary charges for failing to cooperate with Officer Snyder, Officer Snyder testified that he would have permitted defendant to leave the interview at any time and had no interest or intent to coerce a statement from defendant. The appellate court found the reasoning in *People v. Patterson*, 146 Ill. 2d 445 (1992), applicable in this case and held that the trial court did not err in denying defendant's motion to suppress his statements to Officer Snyder.

¶ 42    In this court, defendant again argues that he was subjected to a custodial interrogation without being given his *Miranda* rights, so that the trial court erred in denying his motion to suppress. Defendant claims that the *Miranda* issue can be raised on appeal even though he failed to raise the issue in a posttrial motion because the admission of the statement constitutes plain error. As the appellate court correctly pointed out, however, we first must determine whether any error occurred before we can consider whether the denial of defendant's motion to suppress constituted plain error.

¶ 43    This court applies a two-part standard of review in reviewing a trial court's ruling on a motion to suppress evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). A reviewing court gives great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* However, a reviewing court reviews *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Id.* at 542-43.

¶ 44    With regard to inmates, the United States Supreme Court has held that imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*. *Howe v. Fields*,

565 U.S. ___, ___, 132 S. Ct. 1181, 1190 (2012). There are at least three strong grounds for that conclusion. "First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." *Id.* at ___, 132 S. Ct. at 1190. Second, unlike a person who has not been sentenced to a term of incarceration, a prisoner is unlikely to be lured into speaking by a longing for prompt release. *Id.* at ___, 132 S. Ct. at 1191. Third, in contrast to a person who has not been convicted and sentenced, a prisoner knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence. *Id.* at ___, 132 S. Ct. at 1191. Standard conditions of confinement and the associated restrictions on freedom will not necessarily implicate the same interests that the *Miranda* Court sought to protect when it afforded special safeguards to persons subject to custodial interrogation. *Id.* at ___, 132 S. Ct. at 1191. Consequently, the service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody. *Id.* at ___, 132 S. Ct. at 1191.

¶ 45 Defendant notes that this court on two occasions has addressed the application of *Miranda* to inmates. In *Patterson*, 146 Ill. 2d 445, the court held that the inmate defendant was not "in custody" for purposes of *Miranda* and was not coerced into incriminating himself. In contrast, in *People v. Easley*, 148 Ill. 2d 281 (1992), the court held that an inmate was subjected to a custodial interrogation for which *Miranda* warnings were required. Defendant maintains that the determination of whether the trial court erred in denying his motion to suppress turns on whether the circumstances of this case are more analogous to *Patterson* or to *Easley*. Consequently, we will examine each case in turn.

¶ 46 In *Patterson*, the defendant was placed in segregation after two "shanks" were found in his one-person cell during a routine shakedown. 146 Ill. 2d at 447. After defendant was placed in segregation, Richard C. Irvin, an internal investigator with the Department of Corrections, at the direction of his superiors, requested an interview with the defendant to discuss his possession of the shanks. *Id.* at 448. Irvin's primary duty was to investigate incidents and prepare cases for prosecution. *Id.* Irvin could not have disciplined the defendant if the defendant had refused to speak with him, but a uniformed correctional officer may have given the defendant a ticket, or a disciplinary report. *Id.* Irvin knew that the defendant was in segregation, but did not know that the segregation was punishment for the possession of the shanks. *Id.*

¶ 47 The defendant was handcuffed and escorted to Irvin's office, which contained a desk, three chairs, a credenza, and a filing cabinet. *Id.* The defendant's handcuffs were not removed until he was returned to his cell. *Id.* Irvin's name and title were on the door to his office, which was in a group of offices connected to the cell house. *Id.* Irvin was wearing civilian clothes and was wearing a tag that identified him as an internal affairs official. *Id.* No other prison personnel were present during Irvin's 10-minute conversation with the defendant. *Id.*

¶ 48 The purpose of Irvin's interview was to discover whether the defendant had possessed the shanks in order to protect himself and, if so, whether the defendant wanted to be placed in protective custody. *Id.* at 448-49. Irvin also wanted to determine whether the defendant would have grounds for a "necessity" defense at a possible criminal trial. *Id.* at 449. No charges had been filed against the defendant at the time of the interview, and the defendant was not given *Miranda* warnings prior to the conversation. *Id.* It was a prison policy not to give *Miranda* warnings in interviews with prisoners that had been found with shanks. *Id.* The policy was put

in place after a prisoner brought a successful necessity defense to a charge of possession of a weapon while in an institution. *Id.* In addition, Irvin had found that inmates became "terrorized" after receiving *Miranda* warnings and refused to speak of their safety concerns. *Id.*

¶ 49    During the interview, the defendant declined protective custody and stated that he had no enemies at the prison. *Id.* Irvin did not ask the defendant if he had a shank on the day of the shakedown, and the defendant did not comment on the events of the day. *Id.* Thereafter, the defendant was indicted for the offense of unlawful possession of a weapon by a person confined in a correctional facility, as well as possession of a weapon by a convicted felon. *Id.* at 449-50. The defendant moved to suppress the statements made to Irvin, contending that he should have received *Miranda* warnings prior to the interview. *Id.* at 450. The trial court granted the defendant's motion to suppress, and the appellate court affirmed, with one justice dissenting. *People v. Patterson*, 207 Ill. App. 3d 104 (1990). The appellate court found that the defendant was interrogated while "in custody" for *Miranda* purposes.

¶ 50    In addressing the State's appeal, the *Patterson* court noted that the determination of whether an interrogation is a custodial interrogation requires an examination of all the circumstances surrounding the questioning. 146 Ill. 2d at 454. No single factor is determinative, but among the factors to be considered are "the location, length, mood and mode of the interrogation; the number of police officers present; any evidence of restraint; and the intentions of the officers and focus of their investigation." *Id.* A trial court must examine and weigh those factors and then make an objective determination as to what a reasonable man would perceive if he were in the defendant's position. *Id.*

¶ 51    Considering those factors based upon the facts of the case, the *Patterson* court noted that because the defendant was in segregation, his freedom of movement was increased rather than further limited when he was interviewed by Irvin. *Id.* at 455. The defendant could have requested to leave Irvin's office but could not have requested to leave his cell had the questioning taken place there. *Id.* That the defendant was escorted to the interview in restraints did not place any greater burden on his freedom than when he was taken in handcuffs to the shower or to exercise. *Id.* Therefore, the defendant's freedom of movement was not more severely restricted during the interview than it had been previously. *Id.*

¶ 52    In addition, the purpose of Irvin's questioning was to determine whether defendant was in fear of an attack by fellow inmates. *Id.* at 457. Irvin did not try to elicit an incriminating response from defendant. *Id.* Further, Irvin's office was not inherently coercive, as no police officers were present during the interview and Irvin was not wearing a uniform. *Id.* at 457-58. Although the defendant could have received a ticket for refusing to speak with Irvin, Irvin himself had no power to impose such a disciplinary measure. *Id.* at 458. Irvin only spoke with defendant for 10 minutes and put no physical or psychological pressure on the defendant to answer in one way or another. *Id.* A reasonable man in the defendant's position would not have thought that his will was being subjected to that of his questioner. *Id.*

¶ 53    The *Patterson* court concluded, based upon all of those factors, that the defendant was not "in custody" and was not coerced into incriminating himself during his interview with Irvin. *Id.* Because there was no coercion, the concerns underlying *Miranda* were not present in the case, and the defendant's statements should have been admitted at trial. *Id.*

¶ 54    In *People v. Easley*, 148 Ill. 2d 281 (1992), the defendant, a prison inmate, was convicted of the first degree murder of a superintendent at the Pontiac Correctional Center and was

sentenced to death. Pursuant to the investigation of the murder, defendant was interviewed twice by Pontiac officials. The defendant was advised of his *Miranda* rights prior to the second interview. The defendant later filed a motion to suppress, claiming with regard to the second interview that, although he had been advised of his *Miranda* rights, his right to cut off questioning was not scrupulously honored by the investigators and his statement was obtained in violation of his fifth amendment rights. *Id.* at 296. The trial court denied the defendant's motion to suppress. Because defendant was sentenced to death, his appeal came directly to this court. In his appeal before this court, the defendant argued that the trial court erred in denying his motion to suppress his second statement. *Id.* at 297. The State responded that the defendant was not in custody during the second interrogation, so he was not the rightful beneficiary of *Miranda* rights. *Id.*

¶ 55    The *Easley* court found that defendant was a rightful beneficiary of *Miranda* warnings during his second interview. With regard to the second interview, the defendant was handcuffed, removed from his cell, and taken to the warden's office for questioning. *Id.* at 298. The defendant remained handcuffed throughout the interview. *Id.* Two investigators were in the office for the interview, and a third entered the office after questioning began. *Id.* One of the investigators told the defendant that he had information and considered the defendant a suspect. *Id.* The defendant then was given notice of his *Miranda* rights. *Id.*

¶ 56    The *Easley* court noted that the necessity of advising a prison inmate of his *Miranda* warnings had recently been considered in *Patterson*. Therefore, with the considerations set forth in *Patterson* in mind, the court looked to the circumstances of the defendant's second interrogation. *Id.* at 300. The court first found that the defendant was in custody during the second round of questioning. In support of that finding, the court observed that the handcuffs placed a greater burden on the defendant's freedom than that typically imposed upon him as an inmate. *Id.* at 302. In addition, the defendant was not free to leave the interrogation and remained in handcuffs throughout the entire interrogation. *Id.* In contrast to the defendant in *Patterson*, the defendant was not in segregation at the time of the second interview, so his freedom of movement was not increased as a result of the interview. *Id.* Even the reading of the *Miranda* warnings indicated that the defendant was in custody. *Id.*

¶ 57    The court also found that the defendant was interrogated in the second interview and thus was entitled to *Miranda* warnings. The defendant was interrogated by two investigators, not a prison warden or counselor. *Id.* The defendant obviously was the focus of the Department's energies and was questioned with the intent to elicit evidence to assist in the Department's investigation and ultimate prosecution of the superintendent's murder; the questions were not related to the defendant's needs. *Id.* at 302-03. The defendant was the subject of intense scrutiny by the investigators and was told by one of the investigators that he was considered a prime suspect. *Id.* at 303. Consequently, the defendant was properly given *Miranda* warnings prior to the second interview.

¶ 58    In this case, defendant argues that the circumstances surrounding his questioning by Officer Snyder are more analogous to those in *Easley* than in *Patterson*. Defendant claims that the factors identified by the *Patterson* court support a finding that he was in custody during the interrogation.

¶ 59    Upon review, we find defendant's attempts to distinguish this case from *Patterson* to be unavailing. For example, defendant distinguishes the location of his interrogation—a small

holding cell containing a desk and two chairs—from the "comfortable office setting in *Patterson*." The testimony in *Patterson* was that the defendant was interviewed in Irvin's office, which contained a desk, three chairs, a credenza, and a filing cabinet. 146 Ill. 2d at 448. We cannot say that the addition of another chair, a credenza, and a filing cabinet established that the office in *Patterson* was a "comfortable office setting" when compared with the health care holding tank in this case. There is no evidence concerning the "comfort" of either the interview setting in *Patterson* or in this case, and we decline to find the two locations significantly different in terms of "comfort" in the absence of some evidence supporting that characterization.

¶ 60    Defendant also points to the fact that, unlike the investigator in *Patterson*, Officer Snyder was dressed in uniform with his badge and patches on display. We attribute no significance to this difference, as being around an officer in a uniform, with a badge and patches on display, would be within the normal course of daily life for defendant. As the Court observed in *Howes v. Fields*, 565 U.S. ___, ___, 132 S. Ct. 1181, 1191 (2012), "[f]or a person serving a term of incarceration, *** the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station. [Citation.]"

¶ 61    Defendant also claims that there was nothing voluntary about defendant's questioning, as Officer Snyder personally went to defendant's cell, placed him in handcuffs, and "marched" him to the health care unit.

¶ 62    We first point out that this depiction of defendant's interview is not borne out by the record. At the hearing on defendant's motion to suppress, the assistant State's Attorney asked Officer Snyder, "[w]hen you take somebody out of their regular cell to go to an interview room like this, are they in custody the entire time?" The assistant State's Attorney also asked, "[w]hen you take somebody from their cell to anywhere else, say to the shower or to the exercise area, are they in cuffs as well?" Although the assistant State's Attorney used the word "you" in her questions, it is not clear from the record whether the use of the word "you" was in a generic sense concerning prison procedure or was specifically referring to Officer Snyder in the context of his interview with defendant. Nor was it clear from Officer Snyder's testimony whether he personally brought defendant to the health care holding tank.

¶ 63    In any event, we find nothing inherently coercive in the identity of the person bringing defendant to his interview with Officer Snyder. Moreover, there is no evidence or testimony that defendant was "marched" to the health care unit. In fact, there is no testimony concerning the circumstances surrounding defendant's transfer from his cell to his interview with Officer Snyder other than the testimony that defendant was in handcuffs when he was taken out of his cell.

¶ 64    In addition, the fact that defendant was in handcuffs when he was brought to his interview with Officer Snyder does not establish that defendant was in custody. Like the defendant in *Patterson*, defendant in this case was housed in segregation, in the most restrictive place in prison, and was placed in handcuffs whenever he was taken from his cell to any other place in the prison, such as the shower or the exercise area. As in *Patterson*, the fact that defendant was escorted to the interview in handcuffs did not place any greater burden on his freedom than when defendant was taken anywhere else in the prison.

¶ 65    Defendant also maintains that in *Patterson*, the investigator could not discipline the defendant for refusing to answer questions, while defendant in this case could have been disciplined for failing to cooperate with Officer Snyder. Defendant claims that he would have been guilty of the offense of "impeding or interfering with an investigation" if he refused to answer Officer Snyder's questions.

¶ 66    Here too, defendant's attempts to distinguish *Patterson* must fail. In *Patterson*, the defendant also could have received a ticket for refusing to speak with Irvin, but Irvin himself had no power to impose such a disciplinary measure. In this case, Officer Snyder testified that he knew "because of the situation" that defendant was going to receive an offender disciplinary report or ticket, but there was no testimony that Officer Snyder had any involvement in that discipline or had the power to issue a ticket.

¶ 67    Defendant also asserts that it is significant that Officer Snyder kept him handcuffed during the entire interview. Defendant claims that although this court initially discounted that consideration in *Patterson*, the court in *Easley* relied on that fact as evidence that the defendant was in custody.

¶ 68    Although the court in *Easley* considered the fact that the defendant was handcuffed during his interview as evidence that the defendant was in custody, *Easley* did not hold that fact to be dispositive, nor did *Easley* hold that fact to be *per se* evidence that an inmate is in custody. Rather, the *Easley* court considered the fact that the defendant was handcuffed, along with the other factual circumstances, in finding that the defendant was in custody. With regard to the handcuffs, the *Easley* court noted that in contrast to the defendant in *Patterson*, Easley was not in segregation at the time of his interview, so Easley's freedom of movement was not increased as a result of his interview. Further, the *Easley* court observed that the defendant remained in handcuffs and was "neither physically capable of leaving the office nor permitted to leave until the officers had completed questioning him, both of which circumstances support a finding that defendant was in custody." 148 Ill. 2d at 302.

¶ 69    Here, in contrast, defendant was handcuffed whenever he was transported within the prison, and there was no testimony, nor did defendant allege, that he asked for his handcuffs to be removed during the interview. There also was no testimony or evidence that defendant was not permitted to leave until Officer Snyder had finished questioning him. In fact, Officer Snyder testified at the hearing on defendant's motion to suppress that his questioning of defendant was "just an interview" and defendant was "free to leave at any time." Moreover, as the appellate court observed, it was reasonable for Officer Snyder to restrain defendant during his interview in light of the safety risk Officer Snyder faced, given that Officer Snyder was alone in interviewing defendant concerning his alleged battery of another officer.

¶ 70    Defendant next claims that the intentions of the officer and the focus of the investigation also favor the conclusion that he was in custody. In contrast to *Patterson*, where the investigator was attempting to determine whether the defendant feared for his safety, Officer Snyder testified that the purpose of the interview was to determine whether defendant would admit or deny that he had assaulted Officer Davis. There were no other suspects, so defendant was the focus of the investigation.

¶ 71    While defendant was the focus of the investigation in this case, we do not find that factor requires a finding that defendant was in custody. *Patterson* explained that it is the element of

- 14 -

coercion rather than the mere focus of an investigation that calls *Miranda* safeguards into play. 146 Ill. 2d at 458.

¶ 72    An example of coercion is set forth in *Easley*, where the defendant was questioned for a second time by two investigators, who were joined by a deputy director during the questioning. The *Easley* court noted that:

> "Defendant was the subject of intense scrutiny by the investigators. At the suppression hearing, [Investigator] Read testified that he told defendant that he was considered a prime suspect during the second interrogation and [Deputy Director] Long also indicated the same to defendant in the statement he made to him during the questioning ***." *Easley*, 148 Ill. 2d at 303.

Further, after Easley invoked his right to remain silent and refused to speak to investigators Read and Brubaker, Deputy Director Long nonetheless spoke with Easley and "not only told him that *he had been identified* as one of the murderers, but that if convicted of the crime, he was *subject to being put to death*." (Emphases in original.) *Id.* at 305. The *Easley* court held that Long's statement was made in an obvious effort to persuade the defendant to make a statement. *Id.* at 304-05.

¶ 73    Here, in contrast, the interview of defendant was not coercive. The interview with defendant was his first interview. There were no other officers present when defendant was interviewed. Officer Snyder testified that he put no pressure on defendant to answer in a certain way and did not tell defendant that he could not leave unless he confessed. There was no evidence that Officer Snyder made any statements in an attempt to persuade defendant to make a statement. There was no evidence that defendant refused to speak. When questioning defendant, Officer Snyder was not aware of any charges against defendant outside of prison concerning the incident with Officer Davis.

¶ 74    Finally, defendant claims that the length of his questioning, 15 minutes, was longer than the 10-minute questioning of the defendant in *Patterson*.[1] We find this time difference to be insignificant and insufficient to distinguish this case from *Patterson*.

¶ 75    Based upon our examination of all the circumstances surrounding Officer Snyder's questioning of defendant, we find that defendant was not in custody and was not coerced into incriminating himself during his interview with Officer Snyder. A reasonable man in defendant's position would not have thought that his will was being subjected to that of Officer Snyder. Because defendant was not in custody, the concerns underlying *Miranda* were not present in this case.

¶ 76    The trial court therefore did not err when it denied defendant's motion to suppress. Absent any error, there could be no plain error requiring the appellate court to address defendant's forfeited claim that he was entitled to *Miranda* warnings prior to his interview with Officer Snyder. Consequently, we deny defendant's request for cross-relief and find that the appellate court properly affirmed the trial court's denial of defendant's motion to suppress.

¶ 77    In sum, we find that defendant was properly sentenced as a Class X offender under section 5-4.5-95(b). For that reason, we reverse that portion of the appellate court's order vacating

---

[1]At the hearing on defendant's motion to suppress, Officer Snyder could not recall the exact length of his interview with defendant, although he testified that it was closer to 10 minutes than 30 minutes. Officer Snyder's investigational review report indicated that the interview lasted 15 minutes.

defendant's sentence and remanding for resentencing. We affirm the trial court's sentence in this case.

¶ 78 With regard to defendant's request for cross-relief, we affirm the appellate court's order, which affirmed the trial court's order denying defendant's motion to suppress.

¶ 79 Appellate court judgment affirmed in part, reversed in part.

¶ 80 Circuit court judgment affirmed.

¶ 81 JUSTICE FREEMAN, dissenting:

¶ 82 Defendant's principal argument for cross-relief is that the trial court erred in denying his motion to suppress his admission to assaulting an officer because he was subjected to a custodial interrogation without being given his *Miranda* rights. I agree and would grant the cross-relief defendant requests. The majority concludes that, under the circumstances of this case, *Miranda* warnings were not required and there was no error by the trial court. The majority reaches this conclusion by determining that defendant was not in custody. I believe this conclusion to be clearly erroneous. I would find reversible error in the trial court's denial of defendant's motion to suppress. For this reason, I cannot join that part of the majority opinion and, therefore, must respectfully dissent.

¶ 83 As I previously observed in my dissent in *Patterson*, the procedural safeguards of *Miranda* warnings did not develop in contemplation of the prison inmate being questioned concerning an offense during his incarceration. They developed, instead, in response to the need to protect the fifth amendment rights of persons previously at liberty, cut off from the outside world, and placed in a police-dominated environment. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Thus, the traditional *Miranda* formulation does not lend itself to easy application in prisoner interrogation cases. *Patterson*, 146 Ill. 2d at 461 (Freeman, J., dissenting, joined by Clark, J.).

¶ 84 Although I recognize that *Miranda* clearly is not implicated in every prison inmate interrogation situation (see, *e.g.*, *Illinois v. Perkins*, 496 U.S. 292 (1990)), nevertheless, the inmate, like his unincarcerated counterpart, may be subjected to criminal penalty based upon his incriminating statements. Therefore, I remain firm in my conviction that the prison inmate's fifth amendment rights should be no less vigorously protected.

¶ 85 In order for *Miranda* warnings to be required, the suspect must be in custody. Given the peculiar nature of the prison setting, every inmate is literally "in custody." Thus, it is apparent that the test for *Miranda* in the prison setting requires that some special attention be given to the particular circumstances of each case. The relevant inquiry is whether a reasonable person in the inmate's position would have understood himself to be in custody. *Howes v. Fields*, 565 U.S. ___, ___, 132 S. Ct. 1181, 1189 (2012); *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988).

¶ 86 Defendant states that this court has addressed the application of *Miranda* to inmates in *Patterson*, where the court held that the inmate defendant was not "in custody" for purposes of *Miranda* and was not coerced into incriminating himself, and in *Easley*, where the court held that an inmate was subjected to a custodial interrogation for which *Miranda* warnings were required. Defendant argues that his circumstances are more analogous to *Easley* than to *Patterson*. The majority disagrees and discusses at length the circumstances of *Patterson* and *Easley*. *Supra* ¶¶ 46-59.

¶ 87    The majority recognizes that the determination of whether an interrogation is custodial requires an examination of all the circumstances surrounding the questioning. *Patterson*, 146 Ill. 2d at 454. No single factor is determinative, but among the factors to be considered are "the location, length, mood and mode of interrogation; the number of police officers present; any evidence of restraint; and intentions of the officers and the focus of their investigation." *Id.* A trial court must examine and weigh those factors and then make an objective determination as to what a reasonable person would perceive if they were in the defendant's position. *Id.*; *supra* ¶ 50. The majority then finds defendant's argument that his case is more analogous to *Easley* than to *Patterson* unavailing.

¶ 88    The majority acknowledges that, unlike the investigator in *Patterson* who was dressed in civilian clothes, Officer Snyder was dressed in uniform with his badges and patches on display, but the majority finds this of no significance because being around an officer in uniform with a badge and patches on display would be the normal course of daily life for defendant. *Supra* ¶ 60.

¶ 89    The majority observes that defendant remained handcuffed during the interrogation and discounts the relevance of this fact on the basis that defendant did not ask to have the handcuffs removed. I believe that defendant was restricted as a result of the continued handcuffing. As I observed in *Patterson*, I do not believe that defendant's perceived acquiescence in being so restricted negates the fact of that restriction. I also note that there is no mention that Officer Snyder ever offered to remove the handcuffs. Additionally, although defendant was housed in segregation, defendant was further restricted in the interrogation than if he had remained in his cell where he was not handcuffed. *Supra* ¶ 68.

¶ 90    The majority finds it significant that there was no testimony or evidence that defendant was not permitted to leave until Officer Snyder had finished questioning him. In fact, the majority observes that Officer Snyder testified at the hearing on defendant's motion to suppress that his questioning of defendant was "just an interview" and defendant was "free to leave at any time." Again, I note that there is no mention that Officer Snyder ever relayed this to defendant. *Supra* ¶ 69.

¶ 91    Officer Snyder testified that he knew "because of the situation" that defendant was going to receive an offender disciplinary report or ticket. The majority places great stock in the fact that there was no testimony that Officer Snyder had any involvement in that discipline or had the power to issue a ticket. I do not believe that defendant felt any less compelled to cooperate because the investigating officer would not himself mete out the punishment for defendant's uncooperative conduct.

¶ 92    Officer Snyder also testified that an interview like his interview with defendant occurs in the normal course of an investigation. He testified that the inmate is given a chance to tell his side of what happened. Officer Snyder stated that he wanted to find out what had been thrown on Officer Davis, for the safety of Officer Davis. I take this with some skepticism, as the incident took place seven days prior to the interrogation.

¶ 93    The majority finds that while defendant was the focus of the investigation, according to *Patterson*, it is the element of coercion rather than the mere focus of an investigation that calls *Miranda* safeguards into play. *Supra* ¶ 71. Even though Officer Snyder's interview was framed in terms of safety concerns of an officer, it nonetheless elicited incriminating responses regarding the assault to an officer. Further, I note that subsequent to the interrogation, criminal

- 17 -

charges were filed against defendant—charges, proven with the inclusion of defendant's admission, that led to an enhanced sentence based on defendant's prior convictions.

¶ 94    The majority observes that the interview with defendant was his first interview, there were no other officers present, Officer Snyder testified that he put no pressure on defendant to answer in a certain way and did not tell defendant that he could not leave unless he confessed, there was no evidence that defendant refused to speak, and Officer Snyder was not aware of any charges against defendant outside of prison concerning the incident with Officer Davis. *Supra* ¶ 73.

¶ 95    The majority concludes that after examination of all the circumstances surrounding Officer Snyder's questioning of defendant, defendant was not in custody and was not coerced into incriminating himself during the interview with Officer Snyder. The majority holds that because defendant was not in custody, the concerns underlying *Miranda* were not present. *Supra* ¶ 75. I disagree.

¶ 96    There are some facts that might tend to support a finding that *Miranda* was not implicated: the location of the interview (in a room with a desk, chairs, and credenza) and the length of the interview (somewhere closer to 10 minutes than 30 minutes). However, the facts that support a finding that *Miranda* warnings were necessary are that (1) defendant was the focus of the interrogation, (2) Officer Snyder was in uniform, (3) the purpose included the questioning of defendant concerning the alleged battery of Officer Davis, (4) defendant was handcuffed during the interview and thus was restricted to a greater extent than he was while in his cell, (5) there is no evidence that defendant was aware that he could leave at any time, and (6) defendant could have been penalized for his failure to cooperate. Finally and most importantly, Officer Snyder specifically elicited an incriminating response, which the State used against defendant at trial. Unlike *Patterson*, where the investigator scrupulously limited his questioning to prisoner safety concerns and "the defendant did not comment on the events of the day," Officer Snyder asked defendant "if he actually threw this liquid concoction *** on correctional officer Jody Davis." Officer Snyder testified that defendant "said he did." Furthermore, the State, during closing argument, emphasized that defendant confessed to the crime.

¶ 97    Armed with defendant's confession, the State obtained a conviction for which defendant received a six-year sentence that runs consecutively with his current term of incarceration. I believe the erroneous admission of defendant's confession deprived defendant of a substantial right, which affected the fairness of his trial and undermined the integrity of the judicial process. Consequently, the second prong of plain error review is satisfied.

¶ 98    I would hold that the interrogation of defendant in a police-dominated atmosphere, focusing on defendant and inquiring about the incident giving rise to criminal charges, without informing him of his rights, dishonored the fifth amendment privilege *Miranda* was designed to safeguard. I believe a reasonable person in defendant's position would have understood himself to be in custody. The fifth amendment guarantee against compulsory self-incrimination must be carefully guarded and must not be unnecessarily compromised.

¶ 99    For the reasons stated, I would reverse the trial court's denial of defendant's motion to suppress.

¶ 100    JUSTICE BURKE joins in this dissent.