2021 IL App (4th) 200354

NO. 4-20-0354

FILED
March 25, 2021
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| MALEAH WHITE, | ) | No. 19CM226. |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott J. Black, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Justice DeArmond specially concurred, with opinion.

**OPINION**

¶ 1        In a bench trial, the circuit court of Livingston County found defendant, Maleah White, guilty of sexual exploitation of a child (720 ILCS 5/11-9.1(a)(2) (West 2018)). The court sentenced her to 30 days in the Livingston County jail, with all 30 days stayed; 24 months of probation; 75 hours of community service; and a fine of $300. Defendant appeals, challenging the sufficiency of the charging instrument, as well as the sufficiency of the evidence. We need not consider her challenge to the charging instrument for, under our *de novo* interpretation of the statute defining the offense (see *People v. Smith*, 2016 IL 119659, ¶ 15), the State failed to prove her guilty. The undisputed facts do not meet the statutory description of "virtual presence." 720 ILCS 5/11-9.1(a), (b) (West 2018). Therefore, we reverse the judgment.

¶ 2                                    I. BACKGROUND

¶ 3        The State called one witness in the bench trial, W.B. He testified in substance as follows.

¶ 4        W.B. was a student at Dwight Township High School. In 2018, in the spring of his freshman year, he was 16 years old, and he was on the track team. Defendant was one of his coaches.

¶ 5        Customarily, defendant used Snapchat, a multimedia messaging app, to communicate track information to members of the team. W.B. described Snapchat as "an [a]pp that you send messages with a picture, or you can swipe over and send a chat." He characterized Snapchat as "[j]ust like texting pretty much but on a different [a]pp"—"kind of like texting, just a different way of doing it."

¶ 6        On Snapchat, the photos were, by default, more ephemeral than text messages typically are. The photos automatically deleted themselves when the user exited the app. W.B. testified that the pictures "go away after you click on them and view them and tap out." It was possible, W.B. explained, to screen shoot the pictures on Snapchat—that is, to make a digital image of the pictures as they appeared on the screen of the phone—but the sender would receive a notification that the pictures had been screen shot.

¶ 7        One day in May 2018, when he was 16 years old, W.B. received some images via Snapchat. They were photos of defendant—somewhat risqué photos. According to W.B.'s testimony, defendant was the sender. W.B. wanted to keep the photos, but he did not want defendant to know that he had kept them. Therefore, he used a different phone to photograph the screen images. In other words, he used the camera of a different phone to take pictures of the Snapchat images that appeared on the screen of his own phone.

¶ 8        In the bench trial, W.B. identified 11 pictures that he had received from defendant. These pictures are on a compact disc in the record. They are digital still images of defendant wearing, apparently, a tube top. In some of the photographs, her breasts are partly uncovered. The tube top or towel or whatever she is wearing leaves some cleavage exposed. The hollow between the breasts is visible. In one of the photos, defendant is showing off a tattoo at the base of one of her breasts. The nipples, however, are not visible in any of the pictures. The breasts are always covered from somewhat above the nipples downward.

¶ 9        W.B. testified that there was no conversation between himself and defendant at the time she sent him the pictures. Nor did he and defendant discuss the pictures after he received them.

¶ 10                                    II. ANALYSIS

¶ 11        In defendant's opinion, the undisputed facts fail to meet the statutory description of sexual exploitation of a child (*id.* § 11-9.1(a)(2)). She admits the inappropriateness of her conduct. Nevertheless, she maintains that she committed no crime. Even if a woman's exposing her cleavage above the nipples could fall afoul of the statute—a premise that defendant disputes on commonsensical grounds, since equally revealing low-necked dresses are ubiquitous in our culture—she denies that she committed this act of exposure in the "virtual presence" of W.B. (*id.*). *Cf. id.* § 11-21(a) (for purposes of distributing harmful material to minors, defining "nudity" to include "the showing of the female breast with less than a fully opaque covering of any portion below the top of the nipple").

¶ 12        According to W.B.'s testimony, all defendant did was transmit some still images to him via Snapchat—not a video but still photographs, snapshots. In this respect—and in all other respects—we take W.B.'s testimony as true (defendant does not challenge his credibility), and

insomuch as it would be reasonable to draw inferences favorable to the State from W.B.'s testimony, we do so. See *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000). Viewing the evidence in the light most favorable to the prosecution (see *id.*), we compare this evidence to the statute, which, as we said, we interpret *de novo* (see *Smith*, 2016 IL 119659, ¶ 15).

¶ 13         Section 11-9.1(a) of the Criminal Code of 2012 reads as follows:

"(a) A person commits sexual exploitation of a child if in the presence or virtual presence, or both, of a child and with knowledge that a child or one whom he or she believes to be a child would view his or her acts, that person:

(1) engages in a sexual act; or

(2) exposes his or her sex organs, anus[,] or breast for the purpose of sexual arousal or gratification of such person or the child or one whom he or she believes to be a child." 720 ILCS 5/11-9.1(a) (West 2018).

Thus, the offense described in subsection (a) (*id.*) requires that the defendant perform an "act[ ]" in the "presence" or, alternatively, the "virtual presence" of a "child," defined as someone under the age of 17 (*id.* § 11-9.1(b)).

¶ 14         Originally, the only presence that the legislature envisioned in section 11-9.1(a) was physical presence. The statute used to read as follows:

"(a) A person commits sexual exploitation of a child if in the presence *** of a child and with knowledge that a child *** would view his or her acts, that person:

(1) engages in a sexual act; or

(2) exposes his or her sex organs, anus[,] or breast for the purpose of sexual arousal or gratification of such person or the child ***." 720 ILCS 5/11-9.1(a) (West 2010).

Showing a child sexually explicit Polaroids or other still images would not have violated that version of the statute. Such wrongdoing, in fact, already was addressed in the statute criminalizing the distribution of harmful material to minors (*id.* § 11-21). In section 11-9.1(a), by contrast, the legislature intended to criminalize the probability, known to the defendant, that a child would view sexually exploitive acts that the defendant committed in the child's presence. See *id.* § 11-9.1(a).

¶ 15        In 2010, the legislature amended section 11-9.1 by adding "virtual presence" as an alternative to physical presence. Pub. Act 96-1090 (eff. Jan. 1, 2011) (amending 720 ILCS 5/11-9.1). As a result, subsections (a) and (b) of section 11-9.1 now provide as follows:

"(a) A person commits sexual exploitation of a child if in the presence or virtual presence, or both, of a child and with knowledge that a child or one whom he or she believes to be a child would view his or her acts, that person:

(1) engages in a sexual act; or

(2) exposes his or her sex organs, anus[,] or breast for the purpose of sexual arousal or gratification of such person or the child or one whom he or she believes to be a child.

***

(b) Definitions. As used in this Section:

***

'Virtual presence' means an environment that is created with software and presented to the user and or receiver via the Internet, in such a way that the

user appears in front of the receiver on the computer monitor or screen or hand-held portable electronic device, usually through a web camming program. 'Virtual presence' includes primarily experiencing through sight or sound, or both, a video image that can be explored interactively at a personal computer or hand-held communication device, or both.

'Webcam' means a video capturing device connected to a computer or computer network that is designed to take digital photographs or live or recorded video which allows for the live transmission to an end user over the Internet." 720 ILCS 5/11-9.1(a), (b) (West 2018).

¶ 16        "Virtual presence" means that software, such as webcam video software, creates an "environment" in which the child is virtually in the defendant's presence. *Id.* § 11-9.1(b). (When used with reference to computers, "environment" means the current state of the computer, determined by the combination of hardware and software programs that are running.) In this artificial environment, the child can "view [the defendant's] acts" almost if the child were there, with the defendant. *Id.* § 11-9.1(a). By the virtual-presence provisions of section 11-9.1, the legislature has in mind a computer artifice that apes physical presence: a webcam video or something like it. To meet the description of " '[v]irtual presence,' " the software has to "create[ ]" a you-could-be-there "environment." *Id.* § 11-9.1(b).

¶ 17        The still images that defendant texted to W.B. did not create an "environment" of virtual presence in any meaningful sense of the term. *Id.* They were merely the digital equivalents of Polaroids, only more ephemeral. They were not calculated to create the illusion of physical presence.

¶ 18       When someone takes out a still photograph of family members from a wallet and proudly shows it to someone, the receiver of the photograph does not feel as if he or she has been transported into a presence-simulating environment. The receiver of the still image is not moved to remark, "It's almost as if I'm there, with them."

¶ 19       Snapchat did not create the illusory environment of presence that the legislature had in mind by its use of the term "virtual presence." Unlike Zoom, for instance, which is the video communication app that we used for oral arguments in this case, the Snapchat app that defendant and W.B. used was not a stand-in for physical presence.

¶ 20       We acknowledge that, by " '[w]ebcam,' " the legislature meant "a video capturing device connected to a computer or computer network that is designed to take *digital photographs* or live or recorded video which allows for the live transmission to an end user over the Internet." (Emphasis added.) *Id.* But that is not the same as saying that digital photographs necessarily create an "environment" that apes physical presence. The definition of " '[v]irtual presence' " requires the creation of such an "environment." *Id.*

¶ 21                                   III. CONCLUSION

¶ 22       The statutory element of "virtual presence" is, as a matter of law, unproven. Therefore, we reverse the circuit court's judgment.

¶ 23       Reversed.

¶ 24        JUSTICE DeARMOND, specially concurring:

¶ 25        I agree with the disposition and analysis insofar as it finds the facts failed to meet the definition of "virtual presence" as that phrase is intended in the Sexual Exploitation of a Child statute. I differ in two respects.

¶ 26        First, the focus on the nature of what was transmitted, with no regard for the intent of the sender, was a red herring raised by defendant at trial and maintained on appeal. It is not necessary to analyze how much of defendant's breast was exposed in the photos. The statute places no such anatomic limitations. Regardless of exactly what was transmitted, if the depiction was of a "breast" and was sent "for the purpose of sexual arousal or gratification of [either the defendant] or the child" and otherwise met the requirements for an in-person or virtual presence, the elements of the offense were met. *Id.* § 11-9.1(a). It is the intent of the sender, not the extent of exposure that is relevant so long as what is exposed falls within the definition of "sex organs, anus[,] or breast." *Id.*

¶ 27        Next, although true, the facts presented failed to meet the definition of "virtual presence." There also was a sufficiency of the evidence issue, and the State failed to properly charge the offense under the statute, *i.e.*, a sufficiency of the charging instrument issue. The State alleged defendant "sent unclothe[d] photos of her breast to the virtual presence of minor *** for the purpose of sexual arousal or gratification of the person or the child, or both." From the language of the statute, providing digital photographs would not meet the definition of "virtual presence," since it did not convey a video image such as would be available through a webcam. The obvious intent of the statute is to prohibit the communication to minors of live images, either in person or through video, of either sex acts, or exposure of body parts with the intent to arouse. As a result,

defendant wins reversal not only on the sufficiency of the evidence but also on the defects in the charging instrument.